Petition of **DEN NORSKE AMERIKA-LINJE A/S, Owner of the M/S TOP-DALSFJORD, for Exoneration From or Limitation of Liability.**

Petition of **HAMBURG–AMERIKALINIE as Owner of the MOTORSHIP WEISSENBURG.**

Petition of **UNITED STATES STEEL CORP., as Owner of the STEAM-SHIP CEDARVILLE.**

Nos. A65–19, C66–655, A65–6.

United States District Court
N. D. Ohio, E. D.

Oct. 27, 1967.

Joseph Keig, Jr., Spray, Price, Hough & Cushman, Chicago, Ill., and Thomas O. Murphy, Johnson, Branand & Jaeger, Cleveland, Ohio, for Den Norske Amerikalinje A/S, Owner of M/S Topdalsfjord.

Stuart B. Bradley, Eaton, Jackman & McGover, Chicago, Ill., and Dwight B. Buss, Cleveland, Ohio, for Hamburg-Amerikalinie as Owner of Motorship Weissenburg.

Roman Keenen and Lucian Ray, Mc-Creary, Hinslea & Ray, Cleveland, Ohio, for United States Steel Corp., as Owner of Steamship Cedarville.

Abraham E. Freedman, Freedman, Borowsky & Lorry, Philadelphia, Pa., J. Harold Traverse, Cleveland, Ohio, Ned R. Phillips, Pressman & Scribner, New York City, Victor G. Hanson, Detroit, Mich., Ned L. Mann, Cleveland, Ohio, Louis G. Jarboe, Elmer L. Radka, Rogers City, Mich., Kenneth C. Davies, Detroit, Mich., Jason & Mack, Alpena, Mich., for claimants.

CONNELL, District Judge.

On May 7, 1965 a collision took place in the Straits of Mackinac between the Norwegian Topdalsfjord and the American ore-carrying Steamship Cedarville of the Bradley Fleet of the United States Steel Corporation, as the result of which the Cedarville sank approximately 40 minutes thereafter.

On May 15, 1965 the United States Steel Corporation, as owner of the Cedarville, filed a Petition for exoneration from or limitation of liability against three claimants who were the Administratrices of the estates of three seamen who lost their lives in this collision, and against many of the ship's crew, who were potential claimants.

Such action was filed in the United States District Court for the Northern District of Ohio, Eastern Division.

A similar Petition was filed in the United States District Court for the Northern District of Illinois at Chicago by Den Norske Amerikalinje A/S, Owner of the Topdalsfjord, and another similar Petition was filed by the Hamburg-Amerikalinie, as Owner of the Motor Vessel Weissenburg, a ship which had been in close proximity to the collision, and which had, in fact, picked up all of its survivors.

The United States District Court at Chicago transferred the Petition of the Owners of both such foreign vessels to the United States District Court at Cleveland, Ohio, and the docket of this court discloses some two years' of filings, rulings, proceedings, conferences and pre-trials by counsel with the Court, thereafter.

The Coast Guard conducted a lengthy investigation herein, and in addition thereto, all counsel took depositions of all witnesses herein concerned. This Court did not directly hear any witness, but all counsel had the privilege of reading to the Court whatever evidence it chose, from both the Coast Guard investigation and the depositions taken in these matters; this reading consumed approximately five weeks. Many witnesses testified in both deposition and

Coast Guard proceedings. Some testified several times in both such proceedings.

The question here presented to this Court by the reading of such testimony from these two sources is limited to the question whether punitive damages may be or ought to be assessed in this case.

This was so because at the last in a series or pre-trial conferences Counsel for the three petitioning shipowners and the claimants entered into a stipulation whereby judgment was entered against U. S. Steel and Den Norske on the counts of exoneration and limitation and Hamburg-Amerikalinie was relieved of all responsibility subject only to a special agreement between the three petitioning shipowners. The stipulation further provides that the count for punitive damages proceed against U. S. Steel only. The counsel for both foreign ships worked out an arrangement with the United States Steel Corporation whereby they retired from the case, which was then to be defended by United States Steel Corporation alone, and the Court then undertook to decide the question first as to whether punitive damages were herein susceptible of application, the evidence elicited being limited only to what witnesses had theretofore testified in the Coast Guard Hearings and on the depositions previuosly taken. It was further agreed that after the Court so ruled, a Commissioner would then be appointed to determine what compensatory damages should lie.

We then turn to the question whether, as a matter of law, punitive damages may be assessed in a proceeding of this nature. By way of background, however, we offer first this brief summary of the salient facts which give rise to this issue. Since this remaining phase of the case is limited to the issue of punitive damages, we concentrate our discussion upon those facts which bear upon that issue.

The "Cedarville", built in 1927, was a "self-unloader", 604 feet long, with a 60 foot beam; it had 16 hatches with no water-tight bulkheads. Its equipment included a revolving conveyor belt 450 feet long and 4 feet wide contained within a tunnel below the ship's holds along the center line of the vessel. At the bottom of each hold there was an opening through which the cargo passed down into the tunnel and onto the conveyor belt. Any water which might be taken into any one of the holds of the vessel through the shell necessarily passed down into the tunnel, and in the event of the breach of the shell of the vessel, the water, in passing through any compartment, would immediately find its way into the tunnel and thereupon fill all of the holds. The vessel had no water-tight bulkheads to contain the water in any compartment where the shell of the vessel might be opened up. It was admitted by the operating manager of the U. S. Steel fleet that in the event of a collision and the opening of the hull below the water line the vessel would "sink like a brick". U. S. Steel's fear of such a collision prompted it to provide a "collision mat" about 16 feet by 24 feet, which was intended to be lowered down over any opening in the ship's hull to impede the flow of water into the vessel. This was a completely inadequate precaution against the ever-present danger of a collision.[1]

---

1. There is evidence that the plates in the hull in certain vital areas required replacement by the United States Coast Guard and by the underwriters after inspections; that these replacements had been deferred for a period of almost five years, and that such conditions may have weakened the ship's hull; that there was no plan or program to be followed in the event of a collision; that U. S. Steel failed to provide its Captain with requisite information concerning the buoyancy, stability and trim of the vessel in order to determine its maneuvering characteristics. These and other matters not referred to in our factual discussion show actionable negligence on the part of U. S. Steel, with which the latter was in direct and complete privity. However, these matters will not be considered, and we confine our discussion to those actions showing wilful and wanton misconduct which bear on the issue of punitive damages.

■ The "Cedarville" departed from the Port of Calcite on May 7, 1965 with a cargo of 14,411 tons of limestone. The "Cedarville's" freeboard (the protrusion of the vessel above the surrounding water to its deck line) was 10 feet and ¼ inch.[2] Fog shrouded the area at the time of departure, and the fog signal was placed on automatic and the vessel proceeded at "full speed".[3] This was in violation of Rule 15 of the Great Lakes Rules of the Road which limits vessels to "moderate speed" in fog. The official navigational charts of the United States Coast Guard show recommended courses through the various waters. The recommended course after leaving Calcite was 320 degrees. Captain Joppich ignored the recommended course and fixed the vessel's course at 317 degrees. He stated that the company Captains fixed their own courses; the Coast Guard course from Forty-Mile Point is 301 degrees, but Captain Joppich steered 305 degrees; at Cordwood Point Buoy the Coast Guard course is 270 degrees, but Captain Joppich steered 261 degrees; at Poe Reef the Coast Guard course is 281 degrees, but Captain Joppich steered 285 degrees; at Cheboygan Traffic Buoy, Captain Joppich steered the recommended course at 302 degrees, but for a very short distance, and he thereafter changed to 305 degrees and later on to 310 degrees. Had Captain Joppich followed the Coast Guard courses, he would have completely avoided the disastrous collision. Approaching from the opposite direction were the Weissenburg and about one mile in front the Topdalsfjord. All vessels were using radar in the fog, but the "Cedarville" was not plotting the oncoming vessels to determine their course and speed. As the "Cedarville" approached the Mackinac Straits, Captain Joppich reached an agreement with the Weissenburg for a port-to-port passing, but he was unable to make contact with the Topdalsfjord, which was one mile closer to him. Captain Joppich then blew one blast for a port-to-port passing, but he got no reply and he was unable to make contact with the Topdalsfjord by radio phone. Under these circumstances, with the vessels being between four and eight miles apart, Captain Joppich was required by Rule 26 of the Great Lakes Rules of the Road[4] to sound the danger signal which he failed to do because he did not consider himself to be in an emergency. In attempting to excuse his violation of the Rule, Captain Joppich further testified that he was following the "prudent" Rule No. 27.[5] Throughout his testimony, Captain Joppich defends by afterthought, but traps himself in contradictions. Thus, while seeking refuge in the "prudent" rule, he contradicted himself by first claiming that there was no emergency at the time he blew his first one-whistle blast for a port-to-port

2. Claimants contend that the vessel was overloaded by 6½ inches beyond the point permitted by the Coast Guard Regulations, but in view of the position which we take, we find it unnecessary to reach this point.

3. It was routine practice for all company vessels to proceed at full speed in fog.

4. "Rule 26. If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse." (33 U.S.C. § 291). The requirement to blow the danger signal is of the greatest importance in these collision cases. Petition of Oskar Tiedemann and Company, D.C., 179 F. Supp. 227, affirmed 289 F.2d 237 (3 Cir., 1961).

5. "Rule 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." (33 U.S.C. § 292.)

passing, and then claiming the protection of Rule 27 which applies only when the vessel is in immediate danger. He then resorted to another deception in claiming that it was not stated how far the vessels were apart, so that it could not be said that Rule 26 was applicable. This was likewise untrue for the rule specifically holds that the danger signal must be sounded if one vessel fails to understand the course or intention of the other, whether from signals being given or not answered irrespective of distance separating them. The question of distance is critical only when the vessels shall have approached within a half-mile of each other; at this point if either vessel is in doubt of the other's intention, both vessels "shall reduce their speed to bare steerageway, and, if necessary, stop and reverse". His wilful and deliberate failure to blow the danger signal as required when his first signal was unanswered was a substantial factor leading to the collision. Captain Joppich's activities thereafter further reveal an incredible course of conduct ostending a complete indifference to law and to human safety. As the two vessels approached each other closer and closer, he blew the one-blast signal for a port-to-port passing on four successive occasions; the last one came when the "Cedarville" was literally in the maw of the collision itself. All during this time he drove the "Cedarville" at full speed and never once did he blow the danger signal, nor did he reduce speed to bare steerageway and reverse as required by Rule 26. Had he blown the danger signal even once, and had he reduced his speed to bare steerageway or reversed, he would have escaped the collision. If he had followed the Coast Guard course of 302 degrees, there would have been no danger of collision. The "Topdalsfjord" was far to his right, and when he changed to 305 degrees and subsequently even to 310 degrees, he could still have avoided the collision if he had known the course of the Topdalsfjord, which he could have ascertained simply by plotting the blips on the radar. Instead, he turned the "Cedarville" hard right to 325 degrees, which exposed it broadside to and directly in the path of the Topdalsfjord, with the catastrophic events to follow. The full speed in the fog,[6] the refusal to follow the Coast Guard courses, the refusal to blow a danger signal, the refusal to reduce speed to bare steerageway and to reverse when the Topdalsfjord failed to answer his one-blast signals constitute wilful and wanton misconduct directly related to the collision and the subsequent loss of life and personal injury.

◼ The record also supports the conclusion that United States Steel vested sole and exclusive discretion in the Captains of the vessels, and that the foregoing departures from the Rules were routine practices ratified by the highest echelon of the U. S. Steel Corporation.

The wilful and wanton deviations from law and prudence on the part of the petitioner and its Captain which caused the collision are dimmed in importance by the outrageous misconduct following the collision in deliberately and improperly exposing the crew of the "Cedarville" to death and serious personal injury.

---

6. Captain Joppich testified that he had reduced his speed from Cheboygan Traffic Buoy at 0842 to the point of collision at 0945, but the court rejects this testimony in the face of the indisputable physical facts in the record. The Coast Guard Officers demonstrated that the distance between the Cheboygan Traffic Buoy, which he passed at 0843, and the point of collision, which he reached at 0945, was 12.75 miles. It was proven that he covered this distance in one hour and three minutes. This conclusively established that the vessel was travelling in excess of 12 miles per hour, which was the full speed of the "Cedarville". The Court in this connection also accepts the testimony of Gabrysiak, who testified that the vessel was proceeding at full speed until the hard right turn immediately preceding the collision. Captain Joppich's testimony must be rejected in the light of this evidence.

The collision occurred at 0945 and the ice-breaker prow of the Topdalsfjord tore open a great gash in the "Cedarville's" port side below the water line, which caused an immediate rush of water into her compartments via the conveyor tunnel. Captain Joppich rang the general alarm immediately and directed Chief Officer Piechan to examine the damage to the vessel. He then telephoned station WLC (owned and operated by U. S. Steel Corporation) and reported the collision, which information was transmitted within one or two minutes from the time of the collision on their private line to Captain Parrilla, Manager of the Bradley Fleet, a division of U. S. Steel Corporation, who was then in conference with Admiral Khoury, a top-ranking officer in the corporation office in Pittsburgh, Pa. Captain Parrilla refused to make contact with Captain Joppich, so he stated, and said he intended to leave the handling of the situation solely to the discretion of Captain Joppich. This was the only way Captain Joppich could communicate with Captain Parrilla.

Immediately after the sounding of the general alarm, those men not on watch reported to their lifeboat stations and lowered the lifeboats part of the way down waiting for the order to abandon ship, but the order never came. He ordered the engineers to put the pumps into operation and pump water into certain of the tanks and to start the pump in the conveyor tunnel. The Weissenburg's Captain May telephoned Captain Joppich that he was standing by and offered to take the crew off the "Cedarville," but Captain Joppich refused the offer and asked that he get the name of the Norwegian ship which had struck him.

About ten minutes after the collision, Chief Officer Piechan, after having examined the damage, reported to Captain Joppich that water was flooding the vessel and that the hole was too large for the 18 by 24 foot collision canvas to fit over it.

At approximately 1002, about seven minutes after the report from the Chief Officer, the decision was made to beach the vessel. Captain Joppich testified that he alone made the decision, but by that time Captain Parrilla had received another call which incorporated Chief Officer Piechan's report and he knew at that point that the vessel was "seriously holed", that "she was taking water", and he was also aware at that time of the decision to beach the "Cedarville". Notwithstanding this knowledge and his own admission that the "Cedarville" would "sink like a brick" if she was holed, Captain Parrilla refused to take any action to instruct Captain Joppich or to discuss the situation with him, or so he claimed, stating further that he had given Captain Joppich absolute control over the vessel, and under no circumstances would he interfere with Captain Joppich's discretion even if he were on the bridge of the vessel at the moment with Captain Joppich. Captain Parrilla's testimony in this regard is so shocking as to merit brief quotation as follows (Tr. 335):

> "Q So that even if you knew that she was, in your opinion, going to go down, because of the fracture in the hull, and you knew that the Captain was going to beach her, and that she might go down, and *in your opinion would go down during the course of the run to the beach, you still wouldn't take any action but you would leave it to the Captain?*
>
> A *Absolutely.* I think these decisions and these actions are his."

At the time of the decision to beach, the vessel had lost about four feet of her freeboard and was sinking at the rate of about three inches per minute. Notwithstanding this, Captain Joppich refused to give the order to abandon ship.

After the decision to beach the vessel was made, Captain Joppich ordered the anchor pulled up, but it was fouled on

the bottom. The anchor was freed but not until the engines were put in reverse, whereupon he ordered the engineers to "give her all she had".

In the meantime, the Weissenburg was standing by all the while waiting to take the men off the "Cedarville". Captain May repeated his offer on two further occasions, stating that the Weissenburg was very close at hand with two of its lifeboats swung out ready to take the Cedarville's crew aboard, but Captain Joppich refused these offers and refused to give the order to abandon ship. As Captain Joppich proceeded to navigate the "Cedarville" around the Weissenburg, Captain May made one last plea for the removal of the Cedarville's crew in a most dramatic fashion, as follows:

"A (Continuing) Yes, because that was the moment where the Cedarville nearly crossed my bow, and I was about, let's say, two or three cable lengths of it, see, so the Cedarville must be somewhere over here in that moment. That was the moment, you see— it shows in my log book—when I stopped my ship not to collide with the Cedarville, and that was the moment when I asked him, I contacted the Cedarville again, 'Please, Captain, which side do you prefer that I come alongside to take off your crew,' and this was the moment, when he said, 'get out of my way, get out of my way, I try to beach her,' so I had to stop my ship. This is the time of 1002."

This Court regards the decision to beach the vessel without evacuating the men as an outrageous, indeed horrendous, act of misconduct on the part of Captain Joppich and United States Steel. Seventeen fateful, precious minutes had elapsed since the collision, giving the Captain the fullest opportunity to survey the damage; it was readily apparent that this ship would reach no beach. She was doomed at that point, and it was clear that she would take with her the crew unless he took immediate action to remove the men. Up to that moment he could have removed the entire crew with complete safety. The vessel had been dead in the water anchored to the bottom; the Weissenburg was immediately at hand with its lifeboats out so that the men could have been removed with virtually no danger, either by descending into the lifeboats or by having the Weissenburg come alongside as Captain May offered. At that point Captain Joppich could see that the vessel had already sunk into the water about three or four feet, and that she was steadily sinking at the rate of about three inches per minute. Said Captain Joppich, "I took a gamble" in trying to beach the vessel. This was a wilful, wanton act of misconduct of the worst order which this Court finds to be indefensible. He could have chosen to jeopardize his own life, but he had no right to jeopardize the lives of others by failing to remove the crew before embarking on the run for the beach. Had he so desired, he could have done so simply by directing the engine to be set at full throttle while he handled the wheel on the bridge. Having made the decision to beach,[7] he turned the sinking vessel in the general direction of the shore, without knowing exactly where he was headed and how long it would take to reach the nearest shoreline.

As the vessel proceeded toward the beach, the men stood by waiting for the

---

7. This Court is convinced that the decision to beach was not that of Captain Joppich alone. The evidence sufficiently establishes that the high principals in the company were fully advised of the developments as they unfolded, and such evidence justifies the inference that they might thus reduce the company's liability if they could demonstrate a lack of privity between Captain Joppich and the company officials, and therefore they remained silent. This conclusion is supported by the testimony of witness Brege, inter alia, whose recollection of what she heard over the air on her "ham" radio suddenly became very faulty after a visit by U. S. Steel officials, including Captain Parrilla, the very night before her deposition was taken, as is hereinafter related.

order to abandon ship with their life-jackets on, but the order never came. Without such an order, none of the men were authorized to leave the vessel. The men in the engineroom stood by their posts and the men on duty on deck like-wise remained at their posts. All the crew showed great courage, obedience to duty and dedication to the service in the highest traditions of the American Mer-chant Marine. All the crew performed their duties. This, however, their lead-ership failed to do, at great cost to the crew.

As the mortally wounded vessel labored through the water, sinking steadily at the rate of three inches per minute, her speed was cut down to two or three miles per hour. Captain Joppich was unmoved, however, although he could clearly see the vessel sinking steadily and the mo-mentum of the ship so low as to make the chances of a successful beaching ab-solutely nil. Yet, he refused to give the order to abandon ship when the life-boats could still have been placed in the water while she was barely moving and steadily sinking. He sent a man below to get him a lifejacket. Finally, when the decks were awash, he stepped out of the pilothouse, leaving the third mate and the wheelsman on duty inside, and the engineroom crew on duty pursuant to his orders down in the lowest levels of the engineroom. Even at this late mo-ment lives might have been saved if he had uttered the two fateful words. It seemed as though the vessel was strug-gling valiantly to keep herself afloat and on an even keel until the last instant so that its loyal crew could be rescued, but Captain Joppich was coldly steadfast in his determination that the crew not abandon the ship.

The end came quickly as the decks came awash. The "Cedarville" convulsed and capsized throwing the men, a life-boat and a raft into the water as she went down taking with her the remain-der of the trapped crew. Some of those thrown clear into the water were sucked down but were brought up again by the lifejackets. Captain Joppich, who had stepped out on the bridge from the pilot-house when he saw that the end was near, was thrown clear off the vessel from his high perch. The third mate, Cook, whom he left on duty in the pilot-house, was sucked under and he suffered the same agonizing fate as the others who were trapped in the vessel. Even greater loss of life was averted by the commendable action of the Captain of the Weissenburg. Recognizing that the "Cedarville" was in trouble, Captain May followed her with his lifeboats in a ready position for launching. He detected the sinking on his radar and he heard the cries of the men in the water. His forth-right action in putting his lifeboats in the water and directing them to the area where the "Cedarville" went down un-questionably saved the lives of many of the survivors. He saved all who were saved.

Ten men perished in the water; four from the engineroom department, Chief Engineer Lamp, Third Assistant Engi-neer Radtke, Stokerman Jones and Oiler Wingo; five men in the Deck Depart-ment lost their lives, Third Mate Cook, Deck Watchman Fuhrman, Deck Watch-man Jungman, Wheelsman Haske and Wheelsman Asam; one man in the Stew-ard's Department, Bredow. The remain-ing members of the crew suffered the physical ordeal of exposure in icy water and the mental anguish of death staring them in the face. From this background, we address our attention to the princi-pies of law upon which this case hinges.

Our threshold consideration is whether punitive damages may ever be assessed in a maritime proceeding. Preliminarily, however, we deem it appropriate to dis-cuss the peculiar employment relation-ship between seamen and their employers and between the crew of a vessel and its Master. As stated by the Supreme Court in Southern Steamship Company v. N. L. R. B., 316 U.S. 31, 38, 62 S.Ct. 886, 890, 86 L.Ed. 1246 (1942):

"Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The

lives of passengers and crew as well as the safety of ship and cargo are entrusted to the master's care. Every one and every thing depend on him. He must command and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized. On the one hand, it has imposed numerous prohibitions against conduct by seamen which destroys or impairs this authority."

■■ In the maritime field, therefore, there must be abject obedience to orders from the moment the seaman enters service until his discharge. It is settled that this condition of the seaman's contract is a singular exception to the Thirteenth Amendment's prohibition against involuntary servitude. Robertson v. Baldwin, 165 U.S. 275, 288, 17 S.Ct. 326, 41 L.Ed. 715 (1897). As a consequence, the relationship between the owner of a vessel and its crew fashions a unique doctrine which places the employer *in loco parentis* to the seaman (Robertson, supra at 287, 17 S.Ct. 326) and makes the master the legal guardian of the seaman. The Iroquois, 194 U.S. 240, 247, 24 S.Ct. 640, 48 L.Ed. 955 (1904); Murphy v. American Barge Line Company, 169 F.2d 61 (3rd Cir. 1948). Thus emanates the ancient notion that seamen are "emphatically the wards of the admiralty". Harden v. Gordon, 11 Fed.Cas.No.6,047, pp. 480, 485 (D.C.Me.1823) (Story, J.). These considerations necessarily reflect themselves in our decision today.

The cause of action for punitive damages has always been recognized as an actionable right in admiralty. The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 547, 4 L.Ed. 456 (1818). The Supreme Court of the United States, in Lake Shore and Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1892), in referring to The Amiable Nancy, pointed out that the cause of action for punitive damages was co-extensive in admiralty and the common law:

"The rule thus laid down is not peculiar to courts of admiralty; for as stated by the same eminent Judge two years later, those courts proceeded in cases of tort upon the same principles as courts of common law, in allowing exemplary damages, as well as damages by way of compensation or remuneration for expenses incurred or injuries or losses sustained by the misconduct of the other party."

In Caldwell v. New Jersey Steamboat Company, 47 N.Y. 282 (1872), the New York Court of Appeals authorized exemplary damages in a maritime tort case when a boiler on a steamboat exploded, severely injuring a passenger; the trial court had instructed the jury that if they found the injury resulted from culpable negligence (defining culpable negligence as either a wilful act or an act exhibiting other recklessness for the lives or safety of the passengers), they could consider that circumstance in awarding the amount of damage. Said the New York Court of Appeals:

"The rule of law laid down by the court was substantially correct. Exemplary damages may be allowed not only in vindictive actions so called, such as assault and battery, false imprisonment, defamation and the like, but also in actions based upon negligence * * * And if the jury could find in this case, that the defendant omitted, either in the construction or management of the boilers the usual and ordinary means of protection, and that such omission caused the accident, it would evince that recklessness of the lives, and safety of the passengers, which would justify such damages."

In Ralston v. The States Rights, 20 Fed.Cas. pages 201, 209–210, Case No. 11,540 (E.D.Pa.1836), in a case arising out of a collision of two vessels, Judge Hopkinson, a noted admiralty authority, ruled that punitive damages could be awarded against a shipowner for injuries suffered through the wilful and malicious acts of the ship's captain performed in the course and scope of his employment, as follows:

"In our case, the management and steering of the State Rights were put

into the hands and under the will and discretion of Captain Allen; it was his business, his employment and right, and if he abused his authority by mistake, by negligence, or willfully, to the injury of another, both he and his owners are responsible for it."

See also Day v. Woodworth, 13 How. 363, 14 L.Ed. 181 (1851), where the Supreme Court pointed out that the right of action to recover elements of exemplary damages "seems to have been borrowed from the civil law and *the practice of the courts of admiralty*".

The petitioner, United States Steel Corporation, has steadfastly challenged the power of a court, sitting in admiralty, to step beyond the assessment of mere compensatory damages, but the cases cited by petitioner in its trial brief lend discredit to its argument. Petitioner cites, with favor, The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 547, 4 L.Ed. 456 (1818) for the proposition that the owners of a vessel may never be accountable for punitive damages. The language of the opinion, however, lends the clear implication that in the proper case, admiralty has power to assess exemplary damages:—

Upon the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse. * * * And if this were a suit against the original wrongdoers, it might be proper to go yet further, and visit upon them, in the shape of exemplary damages, *the proper punishment which* belongs to such lawless misconduct.

The court continued, however, and stated that the owners of the privateer which had assaulted the libelants should only be accountable for compensatory damages *in that case:*

But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can scarcely ever be able to secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of opinion, that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages. (pp. 557–8).

Petitioner has also turned the Court's attention to Ralston v. The State Rights, 20 Fed.Cas. p. 201 (E.D.Pa.1836). That court quite clearly found against the first proposition of the petitioner's argument:

I think, therefore, that it is not legally correct, to say that a court cannot give exemplary damages, in a case like the present, against the owners of a vessel. * * * There is no subject upon which more repeated and solemn complaints have been made to the public, and few of a deeper interest to the community, than the accidents, always attended with frightful alarms, and sometimes by the most fatal and melancholy consequences, from the collision of steamboats. * * * Our river has been particularly exempt from these disasters, and it should be the determination, as it is the duty, not only of the courts when appealed to, but of every good citizen, to keep it so. (p. 210).

The most recent authority on the subject is made by Mr. Justice Stewart in a concurring opinion in Vaughan v. Atkinson, 369 U.S. 527, 540, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), which has drawn sharp criticism from petitioner and its gratuitous supporters, Den Norske Amerikalinje and Hamburg-Amerika Linie. In that case, the majority of the court awarded counsel fees in connection with a claim for maintenance and cure. In a concurring opinion, Mr. Justice Stewart, joined by Mr. Justice Harlan, pointed out that the right to counsel fees should have been based on the sea-

man's traditional right to exemplary damages under the maritime law:

"However, if the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman, the latter would be entitled to exemplary damages in accord with traditional concepts of the law of damages." McCormick, Damages § 79.

■ The fact that punitive damages have never been visited upon a tortfeasor in an admiralty proceeding is no reason for precluding such a recovery. The petitioner and its supporters have adduced no persuasive authority nor have they articulated any persuasive reasoning which justifies such a preferential treatment to a maritime tortfeasor. In the absence of a specific rule to the contrary, there is no basis in law or reason for proscribing the recovery of punitive damages in admiralty.

Maritime law draws on many sources; when there are no clear precedents in the law of the sea, admiralty judges often look to the law prevailing on the land. (Igneri v. CIE de Transports Oceaniques, 323 F.2d 257, 259 (2nd Cir. 1963)).

Our next consideration is whether the death claimants, suing as they are under favor of the Jones Act, 46 U.S.C. § 688, are entitled to the recovery of punitive damages under that Act. Examination of petitioner's position here indicates either that its legal research was incomplete or that its argument is fallacious.

■■ One of the purposes behind enactment of the Jones Act was to secure rights for seamen against their employers such as Congress had created on behalf of railroad workers through the Federal Employers' Liability Act. 45 U.S.C. §§ 51 through 60. The original Act of 1908 included a wrongful death statute modeled after the celebrated English wrongful death statute, Lord Campbell's Act, 9 & 10 Vict. Ch. 93 (1846), which permitted a certain class of survivors to sue for their pecuniary loss resulting from the wrongful death of their decedent. At common law the death of a human being, though wrongfully caused, affords no basis for the recovery of damages, and a right of action for personal injuries dies with the injured person. (St. Louis, I. M. & S. R. Co. v. Craft, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160 (1915); Insurance Co. v. Brame, 95 U.S. 754, 756, 24 L.Ed. 580 (1877); Baker v. Bolton, 1 Campb. 493, 170 Eng.Reprint (1808); Speiser, Recovery for Wrongful Death 2 (1966)). In the absence of statute, the general maritime law of the United States does not authorize any recovery for the death of a seaman, whether caused by negligence or unseaworthiness. Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932). The Harrisburg, 119 U.S. 199, 213, 7 S.Ct. 140, 30 L.Ed. 358 (1886).

In this context, the Federal Employers' Liability Act became law. As originally enacted in 1908, it provided in § 1 (45 U.S.C. § 51) for two rights of action for negligence: (1) an injured employee's right of action for personal loss and suffering, and (2) a right of action for the benefit of certain beneficiaries for any pecuniary damages sustained by them as a result of the employee's death. An injured employee's right of action for personal loss and suffering did not survive; it died with him. Connors v. Gallick, 339 F.2d 381 (6th Cir. 1964). However, by an amendment adopted in 1910 adding § 9 of the Federal Employers' Liability Act (45 U.S.C. § 59) provision was made for the survival of the employee's claim for personal loss and suffering, and also for the benefit of the designated beneficiaries.

In 1920, through the Jones Act (46 U.S.C. § 688), the wrongful death and survival aspects of the Federal Employers' Liability Act were extended to seamen's beneficiaries. Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958); Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964); Hutchison v. Pacific-Atlantic S. S. Co., 217 F.2d 384 (9th Cir. 1954). The Su-

preme Court held in *Kernan* that the Jones Act supersedes all state death statutes which might be applied to maritime deaths, and this decision has been recently reaffirmed in *Gillespie*.

■ It is clear, therefore, that while there can be no recovery for the decedent's personal loss and suffering before death if an action under the Federal Employers' Liability Act or the Jones Act is strictly for the wrongful death of the decedent and predicated upon the provision allowing recovery for the loss sustained by designated beneficiaries as a result of the decedent's death, recovery for the decedent's personal loss and suffering before death may be allowed if the cause of action is based on the decedent's right, which survives under the statutes, to recover for personal loss and suffering before his death. These two causes of action are distinct. Chicago, B. & Q. R. R. Co. v. Wells-Dickey Trust Co., 275 U.S. 161, 48 S.Ct. 73, 72 L.Ed. 216 (1927); Williams v. Louisville & Nashville Railroad Co., 371 F.2d 125 (6th Cir. 1967); Connors v. Gallick, supra.

The importance of the survival statute cannot be overstated here; in law, these men, through their representatives, are raised from their watery graves and stand at the bar to demand all that the law extends to their more fortunate fellows who survived. Pimienta v. Marine Navigation Co., 258 F.Supp. 666 (S.D. N.Y.1966).

The case relied upon by the petitioner, Cain v. Southern Ry., 199 F. 211 (D.Ct. Tenn.1911), was decided under the Act of 1908; even a cursory reading of the syllabus teaches that. In the body of the opinion we find this language:

"It is clear under the Act of 1908, which was in force at the time this accident occurred in 1909, in case of an injury resulting in the death of an employé, no provision was made for the survival of the right of action of the injured employé himself. * * * Such survival of the injured employé's right of action was expressly provided for by section 2 of the later amendatory Act of April 5, 1910 * * *. I

also think it clear that *under the Act of 1908, before the amendment of 1910,* in an action brought for the statutory beneficiaries to · recover damages for the death of an employé the recovery is limited to the pecuniary injury or loss sustained by the beneficiaries from the death of the deceased, and that *the measure of damages is compensation* for the loss of such pecuniary benefit as could have been reasonably expected to the beneficiaries, as of legal right or otherwise, from the continued life of the deceased, *excluding all consideration of punitive elements,* loss of society, wounded feelings of the survivors and suffering of the deceased." (p. 212). (Emphasis added).

The above quotation, especially where we underscore, clearly shows that the Act of 1910, providing for the survival of the decedent's right of action, includes punitive damages in the case of death.

Claimants have cited Ennis v. Yazoo & M. V. Ry. Co., 118 Miss. 509, 79 So. 73 (1918) for the proposition that exemplary damages may be recovered in a death action instituted under the Federal Employers' Liability Act. In that case a railroader had been electrocuted by an exposed line which had been brought to the attention of the railroad several times. The court, commenting on the wanton negligence of the employer-railroad, stated as follows:

We will first discuss the question as to whether the instruction for punitive damages granted the plaintiff was erroneous. The record discloses abundant proof, in the testimony of Boswell, that the electric appliance was defective, and had been dangerous and defective for at least a week; it had shocked the witness Boswell six or · eight different times; that he had reported the dangerous and defective condition of the appliance to Desmond and Detrick, both of whom were superior officers in charge of the work and employés in the shop; and that they had, notwithstanding this notice, continued to negligently and wantonly

furnish the dangerous and defective electric apparatus to the employés until the death of Ennis was brought about by its use. So, we do not think the court erred in granting the instruction on punitive damages. It is perfectly clear that the survival action (45 U.S.C. § 59) permits the estate of a deceased railroader to sue for punitive damages.

■ Petitioner suggests that the punitive damages may not be assessed under the Jones Act since that statute does not specifically provide for such a recovery. This argument fails of support. Exemplary damages are the product of the common law and are not a creature of legislation. Thus, while certain statutes may specifically authorize the recovery of punitive damages, such specific reference is neither common nor necessary. Recovery of exemplary damages has been permitted under federal statutes which employ general language as in the Civil Rights Act, 42 U.S.C. § 1983. See Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965). Cf. also Nagel v. Prescott & Co., 36 F.R.D. 445 (N.D.Ohio, 1964); (Securities Act of 1933, 15 U.S.C. §§ 77a–77aa). As stated by the Court in Basista v. Weir, supra, "[T]he federal law permits the recovery of exemplary or punitive damages;" and held that punitive damages are recoverable under that Act which "merely states that the offending person 'shall be liable to the party injured in an action at law.' "

■ The Court is constrained, therefore, to find that under the Jones Act the right of a deceased seaman to sue his employer for punitive damages survives the seaman's death and the claim may be pressed by his personal representative.

We proceed to the next argument advanced by the petitioner, i. e., that the corporate owner may not be subjected to exemplary damages arising out of the misconduct of its subordinate agents. The main thrust of the claimants' argument is devoted to a description of the Captain's actions immediately prior to the collision and for those forty fatal minutes after the collision and prior to the sinking of the Cedarville. Claimants have also offered substantial evidence that officers of the highest rank in the petitioner's corporate echelon actually participated in some of the critical misconduct in this case. The evidence stands uncontroverted that those officers were advised of the Captain's intended actions, yet did nothing to avert their disastrous consequences. The claimants, therefore, contend that the petitioner is responsible for the misconduct of its Master.

We are confronted initially with the decision of the United States Supreme Court in Lake Shore & Michigan Southern Ry. Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893):

> Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offence. A principal, therefore, though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious intent on the part of the agent.

This decision represents the choice of the Supreme Court then between several competing views of the common law. Pizitz Dry Goods Co., Inc. v. Yeldell, 274 U.S. 112, 115, 47 S.Ct. 509, 71 L.Ed. 952 (1927). The question of the propriety of assessing punitive damages against a corporation-employer, however, is not at all well "settled in the leading case of Lake Shore * * *" (General Motors Acceptance Corp. v. Froelich, 106 U.S. App.D.C. 357, 273 F.2d 92, 93 (1959)); on the contrary, there is a great deal of uncertainty despite the above quoted excerpt from *Lake Shore*.

In that case the court begins by showing exemplary damages are imposed only upon one who has participated in the wrong. It then points out that this axiom applies to the master-servant relationship so that some form of participa-

tion—either authorization or ratification—by the principal is necessary to expose him to liability. The court then states that a corporate principal is liable in the same manner as a natural person for the wrongs done by his agent.

The problems which have arisen, ironically, seem to have their origin in the following dictum from *Lake Shore:*

> The rule has the same application to corporations as to individuals. This court has often * * * affirmed the doctrine that for acts done by the agents of a corporation, in the course of its business and of their employment, the corporation is responsible in *the same manner and to the same extent as an individual is responsible* under similar circumstances. * * * A corporation is doubtless liable, like an individual, to make compensation for any tort committed by an agent in the course of his employment, although the act is done wantonly and recklessly, or against the express orders of the principal.

From this the argument is made that since a corporation can act only through its agents, and therefore is responsible for the acts of its agents, there need be no ratification of the agent's misconduct to support a finding against the corporate principal. 1 Sutherland, Damages, 2d ed. 1893; Cf. also, Times Publishing Co. v. Carlisle (Journal Co. v. Carlisle), 94 F. 762, 774 (8th Cir. 1899). The divergence of opinion on this question has led treatise writers into a hopeless state of confusion. As stated by the author in Note, Corporations: Liability for Exemplary Damages, 37 Univ.Det.L.J. 751, 753 (1964):

> The treatise writers are in a similar state of confusion. Mechem states that for the awarding of exemplary damages the principal must also be guilty of wrongful motives. Thompson gives the reasoning for both sides of the question, stating that there are strong reasons for each position. Sutherland states that there is a split of judicial opinion but he seems to favor the no ratification necessary theory

because the corporation had some degree of negligence in hiring the servant, and furthermore can act only through its servants. McCormick, following the federal rule, says that the majority rule requires ratification, but that there is no logical superiority for either side. This has been contradicted by Prosser who finds that the great majority do not require ratification since the corporation can act only through its agents. The Restatement of Torts requires ratification by the corporation or negligence in hiring. (citations and footnotes omitted.)

The most authoritative treatment of the law of corporations, Fletcher, claims that the majority rule and the better reasoned rule, is this:

> But the better rule and the one supported by the weight of authority is that a corporation is liable for exemplary damages if the acts of its subordinate agents and servants were committed wantonly, willfully or maliciously, though not authorized or directed by the company or ratified by it after their commission. (10 Fletcher, Cycl., Corporations, p. 669, Rev. ed. 1961.)

This Court is in agreement with that view. Operating as we are, however, under a judicial system which pays homage to *stare decisis*, we are constrained to follow the Supreme Court's admonition in *Lake Shore* even though we feel confident that the court would make a different choice were it confronted with the question today. Even if we are required to follow the Supreme Court rule, as enunciated in *Lake Shore,* we are not precluded from imputing the misconduct of Captain Joppich to the owner of the vessel. The Supreme Court's rule would affix liability upon the owner for punitive damages if the owner expressly or impliedly authorized or ratifies the act. The record undisputably shows that the vessel owner had reposed total authority in the person of Captain Joppich to extricate the Cedarville from the dangers which confronted it after its collision

with the Topdalsfjord. We need only refer to the following testimony from Captain Joseph Parrilla, General Manager of the Bradley Fleet:

Q Tell us, Captain, why you made no effort to reach the Cedarville from the time you first received word that she was involved in a collision?

A The Master of a vessel under these conditions has his hands pretty full, and I would never think of calling the Master, initiating a call on my part, when he is in the throes of important maneuvers of this kind.

They know they can always get to us if they need assistance of any kind, and this is the real reason I made no attempt to reach the Master of the Cedarville. (Tr. 322).

\* \* \* \* \*

Q I am not trying to get you to give any answer, Captain. What I am concerned with is that a whole hour elapsed, you had a ship out there that had been holed in a collision, she was taking water, the the Admiral of your Fleet is standing next to you, and no one makes an attempt to reach the Captain of this vessel.

A I told you the reason why.

Q You knew she was heading for the beach, didn't you, and you knew that—

A I knew from what information had reached me indirectly.

Q Captain, didn't you testify yesterday that the primary concern of every Master is for his crew?

A The safety of the crew.

Q When you found out he had gone for the beach, what did you do about that information?

A There was nothing to do at the moment. (Tr. 324)

\* \* \* \* \*

Q Captain, I find it quite difficult to understand, if there was any question in your mind, and con-sidering your testimony about your great concern for the crew, why you didn't pick up the telephone and call the Cedarville. (Tr. 331)

\* \* \* \* \*

Q You didn't want to interfere with the Captain?

A He had his hands full. I presumed he did. I am saying that from my own experience, that if I were engaged in serious activities of that kind I would have no time for the telephone. I would be worried first about my crew's safety and the safety of the vessel.

Q Captain, isn't it true that that phone by your side was the same as though you were on the bridge of that ship with the Captain? (Tr. 331–32).

\* \* \* \* \*

A I don't follow your analogy.

Q If you had been on that ship with the Captain would you have conferred with him about the proper means to be taken under the circumstances?

A In what capacity on board?

Q If you had been on board that ship in your capacity as his superior, you would have wanted to confer with him about the proper means to be taken; isn't that right?

A The Master of the vessel is responsible for the actions he takes on the vessel under the circumstances.

Q You mean that even if you had personally been on board in the pilot-house or on the bridge at the time this occurrence took place you would not have opened your mouth, but let the Captain do everything?

A It is impossible for me to say now on a hypothetical establishment as you have just narrated what I would do, and I don't see how I can venture an opinion.

Circumstances are different in each case, as you know. I don't think I could venture an opinion what I would do unless I was con-

fronted with the situation factually. (Tr. 332–33).

\* \* \* \* \*

Q Captain, even if you knew that the fracture of the vessel was such that the vessel was taking sufficient water to capsize her, would you still follow the same rule and leave it to the Captain of the ship?

A Even if we knew that she was being listed; is that what you say?

Q Yes.

A I wouldn't undertake to give the Master any instructions. He is out there on the scene.

Q So that even if you knew that she was, in your opinion, going to go down, because of the fracture of the hull, and you knew that the Captain was going to beach her, and that she might go down, and in your opinion would go down during the course of the run to the beach, you still wouldn't take any action but you would leave it to the Captain?

A Absolutely. I think these decisions and these actions are his. (Tr. 334–35).

Thus a member of the highest echelon of the petitioner, clothed with total authority over the affairs of the Bradley Fleet, testified that Captain Joppich was in complete control of the vessel and that his decision was the decision of the corporation. The corporation thus bestowed full and unfettered authority upon the Master of this vessel; in such a case, the corporation must accept the responsibilities for the devolution of such authority. It has been held that a corporate employer may be compelled to pay exemplary damages if its employee who committed a wrongful act was so high in authority as to be fairly considered executive in character. Winkler v. Hartford Accident & Indemnity Co., 66 N.J. Super. 22, 168 A.2d 418 (1961). The record clearly discloses that in the operation of the vessel Captain Joppich had no superior, was subordinate to no higher corporate officer, so that his actions were tantamount to those of the board of directors.

It is equally clear that the Captain's misconduct was ratified by the Petitioner. The record indicates that Captain Parrilla, the General Manager of the Bradley Fleet, and Admiral Khoury, the man in charge of the entire shipping enterprise of the Petitioner, were apprised of the collision within a few minutes of its occurrence. It is clear that they both knew that the ship had been holed, was consequently taking on great quantities of water, and that Captain Joppich was keeping the men on in an attempt to beach the vessel. No action was taken despite Captain Parrilla's testimony that he knew that the Cedarville "would sink like a brick" if her outer shell had been pierced and the hull opened, as was the case here. (Tr. P. 425). Not one word emanated from Pittsburgh to prevent this certain disaster. Under these circumstances we find that the silence of these top corporate officials reflects a ratification of the wrongful acts of Captain Joppich.

We begin with the admonition of the United States Supreme Court in Supervisors v. Schenck, 5 Wall. 772, 782, 18 L.Ed. 556 (1866):

Like an individual, a corporation may ratify the acts of its agents done in excess of authority, and such ratification may, in many cases, be inferred from acquiescence in those acts, as well as from express adoption. Such ratification may be by express consent, or by acts and conduct of the principal inconsistent with any other hypothesis than that he approved, and intended to adopt what had been done in his name; \* \* \*.

It has been further held that—

Silence of the principal, after knowledge of the unauthorized act of an agent, may, in connection with other circumstances, be sufficient evidence of ratification \* \* \*. (Buckeye Cotton Oil Co. v. Sloan, 250 F. 712, 725 (6th Cir. 1918)).

Thus, the ratification by the corporation need not be explicit, but may be implied

from circumstances consequent to the wrongful act of its agent. Poweroil Mfg. Co. v. Carstensen, 419 P.2d 793 (Wash. Sup.Ct.1966); Almar-York Co. v. Ft. Worth National Bank, 374 S.W.2d 940 (Tex.Civ.App.1964). After the principal becomes aware of the wrongful act of its agent, ratification may be implied by acquiescence or a refusal to repudiate or prevent the full consequences of the wrongful act. See-Tee Mining Corp. v. National Sales Inc., 76 N.M. 677, 417 P.2d 810 (1966): Petroleum Anchor Equipment, Inc. v. Tyra, 410 S.W.2d 238 (Tex.Civ.App.1966).

Thus, in American Photocopy Equipment Co. v. Ampto, Inc., 82 N.J.Super. 531, 198 A.2d 469, 474, where the "[d]efendant, through its president and secretary, remained silent in respect of acquiescence or disaffirmance when it was directly confronted through telephone calls" concerning the unauthorized and unlawful conduct of its agent, the court found that this silence constituted the ratification of its agent's activities. The court relied, in part, upon The Restatement of Agency 2d, § 94 (1958) in finding that silence under these conditions constitutes ratification "when one is directly confronted with the unauthorized act of his agent, [and] according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent." (p. 474) Cf. also, 19 Am.Jur.2d, Corporations, § 1254, p. 660 (1965).

While most of these cases concern ratification by a corporation of unauthorized contracts by its agents, these principles are equally applicable to unauthorized tortious conduct of a corporation's agents. As stated by the author in 10 Fletcher Cycl., Corporations, § 4897, p. 605 (1961 ed):

Although a tort may have been committed by an officer or agent of a corporation without authority and not in the course of his employment, the corporation may become liable therefor by reason of a ratification or adoption of the act. In this respect corporations are subject to the same rule as natural persons * * * (at p. 609) and if it ratifies an act, it becomes liable for personal or other injuries caused by negligence in doing the act."

 Thus it appears, as a matter of law, that a corporation which ratifies an act of its agent may be exposed to liability for all the consequences of that act. It appears, as a matter of fact, that in the instant case the Petitioner's highest officials were informed of the purported course of the Master and were aware that this course made danger a certainty and disaster a strong probability. Under such circumstances, there arose a duty to communicate with the Captain and take the necessary steps to safeguard the crew. Their silence in the face of this duty was a full and effective ratification of the decision of the Master to jeopardize, unnecessarily, the lives of the crew.

Through their wide experience in lake shipping, both Captain Parrilla and Admiral Khoury should have realized the probable failure of the beaching operation. Unmistakably they knew that the retention of the full crew on board was unnecessary. Had the Chief Engineer, the late Reinhold Radtke, been authorized to leave the throttle open (it could have been notched or tied) and to lead his assistants from their engine room tomb to the relative safety of the deck, much less a lifeboat, their useless sacrifice could have been averted. Parrilla and Khoury knew this, yet they remained silent—or so they claim. Joppich did not need an audience—his 20 odd crew members standing on deck—to witness the inexorable decline of the ship's freeboard. Parrilla and Khoury knew this, yet they remained silent—or so they claim.

 The situation, as it was known to Parrilla and Khoury, cried out for an immediate evacuation of the entire crew. With the Cedarville at anchor for fifteen minutes, and the Weissenburg standing by to rescue the crew (and begging permission to do so), circumstances were most appropriate for disembarking the crew immediately after the collision.

What did this crisis evoke from these two experienced men of the sea? Silence. Silence despite the specter of a Captain unnecessarily exposing his crew to death and injury. Silence despite the knowledge that the Captain's efforts to beach the ship were doomed *ab initio*. It is ironic that this silence—undoubtedly motivated by a desire to secure the favor of the limitation statutes and thus reduce or contain the legal ramifications of the collision—now operates to expose the petitioner to a far greater liability. Had these officials been motivated by a righteous concern for the lives and safety of their obedient crewmen, rather than a concern for the possibilities of limitation, we would have no cause to speak in this case. But speak we shall for speak we must. It is the finding of this court that the conduct of Captain Martin Joppich is so oppressively contrary to the dictates of good seamanship, so callously in disregard of human safety, so wantonly careless of the rights of his crew as to justify the imposition of punitive damages, and we impute that conduct to his corporate employer. The petitioner countenanced, encouraged, authorized and ratified his actions.

Many Maritime laws were built on the theory that, in time of danger, contact between sea and shore was physically not possible. Shore Officers could easily prove they did not ratify since there could not be knowledge. The Captain of a sailing vessel in the South Pacific couldn't telephone his Owner's Office in London, or his fleet commander in Oslo. But now communication is faster from ship to shore than an ordinary long-distance call. Here there was immediate contact with the shore office, which has immediate contact with the Fleet Office in Pittsburgh. There was a 40 minute opportunity of frequent communication.

The ancient lack of privity [7] was based on impossibility of communication. Today, the Lake Captain's first call is to the ship-owner! A fair question the trial Judge may ask himself in such a case, since he may judge motivations and self-interest of all witnesses, is—Do the owners say they could make no suggestions under any possible conditions to their Captain, because Joppich was really too busy to receive them—or do they say so to enable themselves to claim there was here no privity? Were not the owners in immediate touch with Joppich? And for what purpose? They could talk of but two things; the ship and the crew. There was no other comparably important thing to discuss. Was there anything said of the men? In no conversation were the men ever mentioned.

Captain Parrilla, on deposition, after the catastrophe, agrees that the safety of the crew is the primary concern of the Master when a ship is endangered; but he admits an utter failure to suggest this primary concern to this Master under these conditions during a half hours busy telephoning, when his Master's primary concern was distinctly not the crew. He so admits by saying he chose to say nothing.

There were really 40 minutes here in which this Master had the opportunity to contemplate, and deliberate, and premeditate, just what he was going to do. Is it proper or not for a Judge to consider that in his thinking, he got all the help the present art of communications could give? He looked down from his bridge on his audience of over 20 of his crew who were in their life-jackets aside of the life boats and in position to leave the ship safely, whenever he could give them sufficient consideration to emit the necessary two words, but somehow for no apparent or proper reason, except his lack of concern for their safety, during

7. While the respondent has waived its defense of lack of privity by consenting to judgment against it on its petition for exoneration or limitation, its argument against the imposition of punitive damages has a subtle flavor or privity in it. We wish to emphasize that, in adjudging the respondent's liability for exemplary damages, a corporate ship-owner stands on the same footing that any corporate employer stands in regard to its responsibility for misdeed of an employee.

this entire 40 minutes of loss of free-board till the deck was awash, he couldn't bring himself to emit the two words. This was wilful in the sense it was most deliberate with full opportunity for reflection. It was wanton in the sense that ten lives were unnecessarily wasted: it was malicious in the sense it exhibited a total indifference for lives in comparison with property.

If ever the words "wantonly," "wilfully," and "maliciously" in their legal significance, could be properly applied to a Master's utter indifference towards the safety and lives of his crew, this is the case.

While the concise recital of the facts given above is indicative of what our ultimate findings of facts herein should be, the Court deems it advisable at this point to review, summarize, and analyze same in a more connected manner, for the purpose of better elucidating such ultimate findings of facts herein.

Our evidence was not adduced in the usual orderly fashion because with so many counsel, some of whom would leave for short periods of time to go to other courts in other cities, we were constrained to hear the evidence as they wished to offer it, at their convenience. We were required to hear the testimony taken at the Coast Guard investigations, and that taken from various depositions, as the convenience of the lawyers required, so that our record may at times appear disconnected, but nevertheless everything any counsel wished to elicit is in the record, even though there may be an appearance at times of lack of connection. Our summary of the record, disjointed as it may seem, results from our efforts to digest the evidence in the chronological order in which it was adduced.

The Cedarville was what is called a "self-unloader." It was 604 feet long, 60 feet beam: 16 hatches: it had radio-telephone; engineroom telephone; at half speed it went 5 miles per hour, and at full speed 11½ to 12 miles per hour. It carried equipment consisting of a revolving conveyor belt 450 feet long, 4 feet wide, which was contained within a tunnel lying in the ship's center, length-wise. To load or unload, it could be extended outwards from the ship.

From the opening statements of counsel and the evidence throughout, we learned that the Cedarville had just left Calcite, Michigan, near Rogers City, which was the home of most of its officers and crew, on May 7, 1965. It carried 14,411 tons of limestone. It had 10 feet ¼ inch of freeboard—meaning that the protrusion of the ship above the surrounding water was 10 feet ¼ inch at its deck line. The claimants say that the Company wanted to carry maximum speed. All agree that the ship departed in a fog and thereafter operated at the highest possible speed, under the order "Full speed ahead." The claimants say that the ship operated at full speed until she "was in the jaws of the collision," and that this was a violation of Rule 15 of the Great Lakes Rules of the Road:

Rule 15. Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rainstorms, or other causes, go at moderate speed. A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other. (33 U.S.C. § 272)

Claimants also assert that, when the Topdalsfjord failed to respond to his passing signal, Captain Joppich was required to reduce speed or stop and reverse, pursuant to Rule 26, which relates as follows:

Rule 26. If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other

both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse. (33 U.S.C. § 291)

The ship's Captain says that he departed from such rules and asserts that he had a right to depart from the rules cited, under Rule 27:

Rule 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger. (33 U.S.C. § 292)

The claimants also say that the ship did not follow recommended courses published by the Coast Guard. The ship's officers testified that they find it better practice to so depart from these recommended courses. The log book recovered from the sunken vessel indicates such changed courses. The ship's Captain says they cut corners but that this is harmless, while the claimants say that the farther a ship goes after it increases or decreases its angle of travel from the recommended course, the more dangerous its operation becomes. The Coast Guard prescribes these courses in order to keep all vessels on parallel courses in these channels and thereby to diminish the possibility of collision. Yet here the petitioner claims that deviation is harmless.

As the Cedarville proceeded northerly and as it was approaching the Straits of Mackinac, its Captain knew that the ships Weissenburg and Topdalsfjord were both approaching him, coming south, and that both had already passed the Mackinac Bridge. There is no question but that the Cedarville's Captain knew of these two vessels, and that he agreed with the Captain of the Weissenburg on passing signals. However, the Cedarville got no response from the Topdalsfjord. The evidence is that the Topdalsfjord preceded the Weissenburg; that it had passed the Weissenburg before passing the Mackinac Bridge; that it had asked the permission of the Captain of the Weissenburg to pass the Weissenburg because "it was a faster ship," and that it did so.

Claimants herein claim that when she moved through fog at full speed, the Cedarville violated Rule 26, in that it should have reduced its speed and that when the Cedarville received no response from the Topdalsfjord she should have stopped and should have reversed her engines, but that she continued ahead at full speed. All the evidence in the case so indicates, till very near the point of collision.

Captain Joppich testified that he tried to follow the course of the Weissenburg and the Topdalsfjord on his radar, and that when the Topdalsfjord came out of the fog, he turned hard right, and then hard left, to avoid collision, but was struck amidships on his port side. Some witnesses on the Cedarville described it as a slight bump at right angles, but the Topdalsfjord had a prow designed and constructed as an ice-breaker, and in this collision it "holed" the Cedarville above and below the water line, giving it what was immediately recognized by the Mate sent to check it as a "mortal wound." The evidence is that the effort to cover the hole with a canvas mat constructed for such purpose was completely unavailing, because it was not large enough to cover the hole, and that the ship took on an uncontrollable flow of water, and from the time its hull was pierced, it began inexorably to sink, and did so in a final convulsive capsizing movement in approximately 40 minutes after it was struck, as a result of which ten men lost their lives and some twenty men here claim damages for injuries and exposure.

The evidence is that the Cedarville did not have water-tight compartments. Witnesses agreed that when a self-unloader ship without water-tight compartments is holed as this one was, "it goes down like a brick." The evidence is that the Topdalsfjord, with its ice-breaker prow, penetrated the Cedarville to its hatches.

The evidence is that on collision, the Captain stopped engines and gave a general alarm; that the crew immediately reported in their life jackets. The Mate was then sent to assess the damage, and

quickly reported to the Captain that the hole was too big to put the canvas mat over it. The hole was larger than the 18 x 24 foot mat. The amidships hole was so large the Captain could see it from the bridge. The Captain put an anchor out and got into radio communication with his shore office. This was done within one or two minutes of the collision. The evidence further is that the collision took place at *9:45 A.M.* and she sank at *10:20 A.M.* The evidence is that the shore office immediately called the Pittsburgh main office. Mr. Smart, Traffic Manager of the Bradley Fleet at Rogers City, was told by Captain Joppich that the ship was hit, "holed," "taking water," and in "serious trouble." Within one or two minutes, Captain Parrilla, Manager of Operations of the U. S. Steel Bradley Fleet at Pittsburgh, got the message from Mr. Beuhrens, Assistant Supervisor, who got it from Mr. Smart. Captain Parrilla testified on deposition that Beuhrens told him the ship was "holed," "taking water," and "in serious shape."

All the evidence indicates that the Cedarville steadily sank. Its freeboard of over 10 feet was, during the 35 to 40 minutes of its sinking, decreased to nothing. Its deck was awash before it convulsed, capsized and went down. At no time was any order ever given by this Captain to his men to abandon this ship. At no time was this Captain ever told by his superiors ashore, with whom he was in direct and immediate communication, to save these men. At no time were any officers or members of this crew ever authorized by this Captain to leave the ship. Lifeboats were at deck level but no one ever was authorized to enter them, or to lower them except to the deck level, or to leave the ship.

We find that the Captain of the German ship stood by at all times offering to take the crew off and that his offer was rebuffed, and that he was told to get out of the way by Captain Joppich when he finally decided to turn his ship around in an effort to beach it. After the catastrophe was complete, the German ship saved all who were saved.

Certain action was taken by the Captain after his ship was holed on the port side amidships. The Captain first ordered the engineers to pump ballast out of the No. 4 port side tank because the water had entered where the port side had been holed; that the Captain had been told that the water so entering was too much for the pumps to handle, under which conditions the Captain thereupon ordered that the pump on tank No. 4 stop and further ordered water taken in on the starboard side. The engineer who did this pumping testified that orders came from the pilothouse to "ballast on the starboard side" and water was taken in to all of the seven tanks on that side except the one water tank for boiler water. The evidence is that such seven pumps were still in operation when she capsized.

The evidence is that the Cedarville, though it was sinking, was nevertheless going down on an even keel until such time as the water taken into all seven tanks on the starboard side caused it to capsize. The Captain testified that he ordered such ballasting to stop, but Wheelsman Gabrysiak, who had the 8:00 A.M. to 12:00 Noon watch and was thus aside of the Captain from 8 A.M. till the vessel capsized, said no such call was ever made. Witness Tulgetske testified none was made between the time he started taking on ballast and the time he left the engine room; when he left the engine room, the deck was already awash. Witness Bey, the last to escape from the engine room, said the ballast pumps on the starboard side were still going when she rolled, but that he heard no such ring. He never got to the main deck, but, as she capsized, he was thrown into a room where his leg was broken and he was able to escape through a porthole. We find that water was so pumped into the seven tanks on the starboard side as to have caused this vessel, which had already lost so much buoyancy, to suddenly lose its balance and capsize to the starboard side.

We find further from this evidence that the Captain never gave any order to stop the intake of water into the seven

tanks on the starboard side, and that they were still in operation when she capsized.

The evidence further shows that the men had put on life jackets very early in the general alarm, but that none were ever authorized to leave the ship; that the men in the engine room had theirs on too; it further shows that the Captain signalled the engine room with the chadburn and he had put that signal on "Full speed" in an effort to beach the ship, and the engine men were still obeying his orders when the ship capsized and sank; that as of the time it sank, its speed was down to 2 or 3 miles per hour, due to lack of buoyancy. We further find that, considering the position at which it sank, from the exhibits in the case, and at the diminishing rate of its speed due to its utter lack of freeboard and buoyancy, the chance to have beached it was, for all intents and purposes, practically nil.

Shortly before the sinking, the evidence shows that the Captain had sent a man below to get him a life jacket. The ship's final convulsion and capsize threw both life boats and all men on its deck free. Its sinking hurled loose the rubber life rafts from its upper deck; these rafts were later used by some fortunate survivors to keep themselves afloat. The Captain had stepped out of the doorway of the pilothouse just as the ship capsized and he was thrown clear and escaped, but the Wheelsman just behind him was thrown back into the pilothouse and never got out. Thus, while no one had dared to abandon a ship with no freeboard left and the deck awash, the ship thus abandoned them.

The deck was awash as the Captain stepped off the bridge. The Captain had been using the chadburn to signal the engine room till such a time as he decided to leave the ship. He gave no notice to the men in the engine room that he was about to leave. He had been intermittently busy at the radio telephone since the Cedarville was holed. He had a telephone to the engine room where men in life jackets were busy with the Captain's signals of "full speed ahead" but he failed to use it to tell them he was leaving, or that they could leave. They were faithfully answering his signals, though the ship was necessarily going more slowly as it lost buoyancy and freeboard and took on more water, in addition to its 14,411 ton burden of limestone. While it could attain about 12 miles an hour at full speed, it was down to two or three miles an hour before it sank. Of course the men in the engine room knew nothing of the conditions above.

This Court finds that the Captain saw there was water on his deck and that his ship had lost its buoyancy, and that there was nowhere for the ship to go but down; that had he given any thought at all to his men, and had he sacrificed just two seconds of the telephone time which he used to save his ship, for the purpose of saving his men, and had he emitted just two words into the engine room telephone to save his men, viz., "Abandon Ship," during the last minute before it sank, with five or six ways out of that engine room, some might have had a chance for survival. With any fair, due and proper notice, had they three to five minutes, all could have been at a safe distance in life boats. In fact, all should have abandoned ship when its freeboard was close to disappearance. The German Captain had considered it necessary forty minutes before the capsize.

Again, not once does this record show one word of consideration for anything but the property involved. His claim that it wouldn't have been safe to let them off was an afterthought. The Topdalsfjord had pulled out and away and disappeared. The Weissenburg followed slowly a half mile behind and saved all who were saved, including this Captain. So their danger was not in leaving; it was in staying.

Not once had he said one word about what was to be done for any one man, except the sending below of a man, very close to the sinking, to get a life jacket for the Captain.

Not one word two minutes before the final convulsion and capsize as to whether all were accounted for; whether they were all ready to get off; or to the effect they were finally permitted to leave. In

fact, when the ship capsized, they were all literally thrown off of its deck, including the Captain, and to a comparatively safe distance. Of the survivors, only the Captain "went down like a bullet" in the suction of the ship, but his life jacket brought him up. The man aside of him never made it.

Never one word or thought was given to the men below who were about to be drowned, just to keep it full speed ahead, when there was only one place it could go, and that very apparently was not a beach. Theirs was a misplaced loyalty and obedience to him. His was a false sense of duty to protect property regardless of its cost to 30 faithful seamen and their families. Were it not for the Weissenburg many others and this Captain could have lost their lives.

Out of the 35 to 40 minutes he had had in which to do something to save the ship or save the men, this Captain would not give up the necessary two seconds to say the necessary two words to keep the engineroom men from being needlessly and uselessly drowned. One or two more seconds could have saved his Wheelsman besides him, who lost his life because he was a step behind the Captain in leaving the pilothouse as the ship capsized, convulsed and sank. Even there, this Captain put his own interest first, and it paid off.

The Captain asserts throughout the case that his first thought was for his men and not the ship. However, his actions are more demonstrative, more vocal, than his words. Not one of these men was ever authorized to abandon or leave this ship. The ship's convulsion threw over twenty of the men off, it threw the lifeboats and loose rafts off; it threw the Captain off the pilothouse, and it threw the Wheelsman within.

On trial, this was all said by defense to have been done on a "calculated gamble" to save the ship. "Calculated" is a misused word here. If the Captain or anyone knew exactly where they were in this fog, or where the closest beach was, or how to avoid shoals, or how to plot the prospective movement of the vessel, there is no evidence that there was any real "calculation" about it; no one knew whether there was any chance to reach any beach at the attainable rate of speed under the prevailing conditions. The Captain finally, after the loss of the first fifteen minutes, ordered the German vessel out of his way while he tried to turn his ship around and go full speed somewhere else, but it soon capsized and sank so fast that this could hardly be said to have been a "calculated risk." This was "no calculated risk"—it was a horrendous gamble.

There was really no opportunity for a "calculated" risk because from the evidence in this case, it is clear that this Captain really did not know his vessel. The petitioner never provided him with, nor did he ever seek to discover, the trim and stability data of his vessel. He had never seen the hydrostatic curves of his ship. He did not know the metacentric height of his vessel. In short, Captain Martin Joppich had ignored the maritime edict that "the Master must know * * * the maneuvering qualities of his own vessel." Griffin Collision 576 (1949).

Yet, before a rational decision could have been reached to beach the vessel—rather than abandoning her—it would have been necessary to calculate the loss of buoyancy, the trim and stability, the speed attainable, the distance to be traveled, and the time which the vessel could remain afloat, under all the conditions then and there obtaining. Yet not one of any such requisite calculations was ever made. (Tr. 883, 885–886).

Obviously all the consideration and thought of this Captain was for the ship alone, with the expectation that he could finally step off in safety because he had the advantage of looking down at the entire scene from the pilothouse, and no one else could or did move till he said so. Ironically, the capsizing ship made the decision which he was so grudgingly reluctant to make. It literally catapulted everybody and the lifeboats and rafts off its deck and into the surrounding water.

These claimants claim that the engine throttle could have been set at full speed and the engineroom men could have come

up on deck and have had a chance for safety. The Captain stated that he did not think so. With so many years on ships, beginning as a porter and working his way up to Captain, he has been in enginerooms often enough to know that a throttle could be set in a notch, or tied, and that the engine would continue to operate for some length of time before need of any other manual operation. That was the testimony of the engineers who survived.

Again, he defends by an afterthought, because if he should say he knew the throttle could be put in a notch, that would be tantamount to admitting that his engineroom men were needlessly held at their post and drowned. Petitioner claims it would have been dangerous to thus have an engineroom unmanned. The engineers dispute this. There certainly was danger here, but it emanated from this Captain's callous disregard for his duty to men chained to this sinking coffin by their own devotion to duty towards him. Joppich was not really concerned with another collision here because he was again operating in fog and the highest speed attainable. Joppich knew that the throttle had notches for some purpose. He forced those men to work in imminent danger of drowning to save a ship already doomed by all the laws of nature and physics, which it was his business to know and understand.

Other witnesses who worked in the engineroom stated the throttle could have been put in any one of its several notches and the engine would have functioned. When the Captain was about to leave, he knew that there would then be no one at the wheel and that he had no further need of engine propulsion; and yet he stepped out of the pilothouse and sent the men below to their doom, for lack of two words.

When informed of the danger to their property, the officers of the ship's company, the owners of this vessel, made no move or gave no order or suggestion to their Captain to give their men any preference over their property. This they could easily have done to the ship or to the near-by-office. No one on either end of that phone says that one word was said, at either end of the line, about these men. As experts (one was once an Admiral in the United States Navy), they knew there was little or no chance to beach this ship under these conditions. But whether there was or not, had one word been said by the owners about saving these men, this Captain might then have given some thought or word to them. Under all these conditions of the immediate danger of sinking, even with the deck awash, this Captain never authorized any one man to leave this ship. The sudden capsizing and convulsion of his ship threw his men and himself off its awash deck, but he never gave them permission to leave. As the Captain stepped off he gave absolutely no word or thought to these men below, whom he now professes to have known so well and to have so highly regarded. Those awaiting on deck stood in his sight through more than one half hour's agonizing anxiety, and he never uttered the two words which would have released them from their obligation to him.

Irrespective of anything which may have been said in the various phone calls between this Captain and his principals, the owners of this ship, there was nevertheless a responsibility on these owners and their representatives, as well as on this Captain, to give some little consideration to all these lives then in such imminent danger. They had 45 minutes in which to talk about it, and did so; they had only two things to talk about, the ship and the men. There is no shred of evidence before us that anything was discussed other than their property. In all his time on the phone the Captain does not say his crew was ever mentioned. Nor does he say in the 45 minutes in which he had to say something—though he did give orders to save his sinking ship—that he ever said one word relating to the safety of a single person, except to the man whom he sent to get his own life jacket. In concluding his deposition testimony, the Captain admitted that he had a thirty second warning that the ship was going to capsize, and he reiterated that its speed had slackened to

about two miles per hour, but he used that 30 seconds for himself alone.

In concluding his testimony the Captain had further stated the ship sank 40 minutes after the collision; that he was thrown off the ship when it finally convulsed; and he went down with the suction "like a bullet;" that he was 45 minutes in the water, and he swam and was rescued by a German lifeboat; that the speed of the ship before it sank was down to two miles per hour; and that he had a 30 second warning that it was going to capsize.

So it is apparent that he knew very well that he couldn't beach this ship because all its freeboard was lost in that last half hour and it would have taken at least another half hour more to reach any beach at the rate he was going of two miles an hour. He had given all his thinking—all his activities—all his efforts—to two things: To salvaging the ship, and to having that finally necessary few seconds to get himself off a ship whose final sinking was as certain as it was imminent.

Wheelsman Gabrysiak testified that it was foggy; the fog was so heavy he couldn't see the pilothouse. He noticed the clock on the pilothouse at time of collision: 9:43: that the ship was put hard left when collision was close, as the other ship came in sight, and then hard right; that after impact the engines were immediately stopped and the anchor dropped. The other vessel made a 45 degree change after collision. The general alarm was immediately sounded. He testified that the Captain was then engaged in talking on the phone: a "May Day" distress call went out; he left the pilothouse when the ship settled to port to get life jackets; then the Captain wanted the anchor up, but it was "hung up." The Cedarville listed heavily to port to a 35 degree angle. *The Captain was constantly on the phone making communications;* the Captain backed the ship, which freed the anchor; the Captain ordered the engineroom to get her at full speed ahead. Water ballast was taken on to lessen its list, but it necessarily decreased its buoyancy be-

cause so much water had filled the ship, since it had no water-tight compartments. *The ship was under way for 25 minutes, then it listed 40 degrees to starboard, and sank.*

At the end, the ship started to roll for a couple of seconds—then it rolled altogether—the Captain shut the telegraph off. A "May Day" call was made just before she rolled. She rolled to starboard; he went out on the port wing; the rolling put him in the water.

He testified that before the collision there had been continuous fog signals and three or four long blasts but no response. We find that it is very obvious that in such a fog that Rule 15 was here violated because in thick weather, and in such fog, the vessel should have been put at "moderate speed" and taken off "full speed." We find it was at full speed in heavy fog long before this ship became aware of the presence of other ships.

We find that here Rule 26 was violated because the pilot who fails to understand the course or intention of an approaching steamer, from erroneous signals *or other causes,* or the pilot *in doubt,* shall, under such rule, sound several short and rapid blasts of the whistle, and if the vessels are within one-half mile proximity of each other, both should reduce to steerageway, and, if necessary, stop and reverse. Since Captain Joppich received no answer from the Topdalsfjord, he was surely in doubt of its intentions and he was then within a half mile of its proximity; he should have reduced to steerageway, and if necessary, stopped and reversed. Had he done either there would have been no collision.

We find that had this Captain not operated at full speed through this fog, on this occasion, there would have been no contact. The evidence is that not only did this Captain operate through fog at full speed on this occasion but that he always operated at full speed through fog on all other occasions. In fact, there is evidence here that such is the practice in this fleet. This has to be known by the owners of such vessel and fleet because of the recorded distances this ship and

others have covered within specified times, for a long time. Such is known from their log books and from daily specified telephonic reports at particular reporting times. We find from records and reports they know and knew here that their ships generally travel full speed through fog, and have done so for a long time.

Rule 27 allows of departure from other rules when such departure is necessary to avoid immediate danger; Captain Joppich has here testified that his departure from the Great Lakes Rules of the Road was based on what he calls the "prudent rule," and he interprets Rule 27 as giving him the right and power to depart from the Rules regarding dangers of navigation and collision, and to consider special circumstances which may render a departure from the above such rules necessary *to avoid immediate danger*. Was not much of this danger of his own creation? How did violating Rule 15 avoid immediate danger? How did going full speed ahead in heavy fog avert any danger? How did failure, when the Captain-Pilot was in doubt, under Rule 26, to sound several short, rapid blasts of his whistle, avert any immediate danger? How, under Rule 26, when within half a mile of another ship, did this Captain's failure to reduce to steerageway, or stop and reverse, avert or avoid danger? We are constrained to find that his own failures in these many respects created this particular danger of collision. We find he did not avoid danger; he created it. The fact is that the full speed ahead in fog cannot be excused by the claim that this Captain was so "prudent" that he comes under the protection of departing from rules under Rule 27. There can be no proper legal departure from the rule against full speed ahead in a fog. And this Captain blandly asserts the right to so operate at all times and says he so operated in all fogs. In each case, as he violates rules, his claimed motive is "Prudence." The Rule was intended to prevent full speed ahead in fog. Full speed in fog does not constitute "prudence." Rule 15 requires moderate speed, and sometimes bare steerageway, and navigation with caution under certain conditions. No one has a right to flagrantly violate this rule and then justify his violation by describing his own misconduct as "prudence," which is this Captain's fallacious defense. His habitual full speed ahead in fog has to be known to his company. They ratify it by not ordering him to discontinue such a dangerous practice, year in and out, on all his voyages. Their failure to order him to stop such practice indicates their desire that he continue, and thus they ratify and approve the practice, for it has the advantage of completing each voyage, quickly. Speed may be to their ultimate advantage, but it never justifies such deliberate violations of Rules as happened here.

Rule 27 did not give this Captain the right to violate Rules 15 and 26. Rule 27 protects men who seek to avoid danger caused by the errors of other navigators. It is no shield of protection for navigators whose violations cause collisions, such as happened here.

Third Mate Cook told the Captain they were four miles from the beach when they started. The best they could make was five to six miles per hour, which had gone down to two miles per hour before the sinking. Obviously, at two miles an hour, they needed a half hour to go one mile. From the point of sinking indicated on the Map, Freedman Exhibit 45, it does appear that they could never have made it, nor did the Captain or anyone else ever express any confidence they could. This really means they had no reasonable chance of saving the ship by beaching. The Weissenburg had offered to take off the men immediately. When there was over a half hour left in which to take them off, and since the "mortal wound" had immediately appeared, the offer should have been accepted, had the Captain put the men ahead of the ship, or had he considered them at all.

The First Mate Piechan, 31 years at sea, when questioned by Lt. Commander

Gove, related that their course began at 317 degrees, full ahead, in a light fog, visibility 1¼ miles, fog signals blown every minute, automatically. They changed to 305 degrees; changed course at 7:48, radar operating well. He turned in. While still asleep, he heard alarm bells, saw his ship was struck but did not see the Topdalsfjord on the port side; he had felt a little impact. He went back to quarters and dressed. The Captain told him to get the collision tarpaulin. It consisted of a canvas, with two lead pipes at each end, and ½ inch ropes. The ship was already listing. He put it over the hole on the port side. He saw that three or four feet of the spar deck was cut into. The hole "looked awful wide."

He looked down into the cargo hold from the top. There was water in the cargo hold, a tremendous amount of water, and more than the pumps could hold. The vessel listed 10 degrees; the hull was cut to the water line and past the water line. The hole was too big; the tarp stayed out from the ship's side.

Lt. Commander Gove of the Coast Guard questioned Gabrysiak, then represented by counsel Keenen, who is also counsel for U. S. Steel Corporation herein. Gabrysiak stated that he was a Wheelsman on the 8 to 12 watch; he had been 17 years with the Bradley Fleet of the U. S. Steel Corporation. It was the testimony of Gabrysiak that they passed close to Cheboygan Buoy and changed course 268 degrees right to 302 degrees. Steered 302 degrees till a pip showed close on the radar; then 305 degrees full speed; then 310 degrees. The Captain called the ship (the Topdalsfjord) but got no answer. The Steinbrenner told the Captain he also called the ship and got no answer. They gave fog signals. Continuing in 310 degrees, the Cedarville passed the Ford, but the Topdalsfjord was still "coming at us." The Third Mate warned the Captain of the proximity of Major's Shoal; the ship was steadied at 325 degrees. After that the Captain reduced her to half speed, but the Topdalsfjord "was bearing in on us."

We gave one long blast and the Captain tried again to reach the Topdalsfjord. The Cedarville could come no further to the right of the channel because of the proximity of the shoal. With the Cedarville still blowing short blasts and a long blast, the Topdalsfjord suddenly appeared out of the fog on a 45 degree angle. The Cedarville held to "slow" when the Topdalsfjord was first sighted, approximately 600 feet away. When it was 100 feet away they were still on 325 degrees. The Captain put the engine full ahead and hard right and hard left on the wheel; the other vessel was "perpendicular to our bow," and on a steady course, and the Cedarville was struck amidships on the port side. Gabrysiak knew it was a mortal wound. He went back to get the boys to the lifeboats and "have no panic." He told the Captain the tarp would not hold. The Captain said he would try to beach her.

The gash was between the 10th and 11th hatches. The cargo was down 8 feet.

The boats were lowered to the bulwarks. She was settling but had straightened up. At the last second, Piechan, on his own, said "Get in the boats, boys." She flipped so fast to the port side and then to the starboard side— he had one foot in but didn't make it. When she flipped and sank he found himself in the water—he got on a raft and saved Idalske. He saw the German ship coming up. Six men pulled him onto the raft. They had only one oar. He was cold and numb. His watch stopped at 10:25. It was a steady capsize and fast.

Captain Werner Otto May, Master of the Weissenburg, Hamburg-Amerika Line since 1955, on deposition said that he had captained this ship since 1955, that it has radio telephone. He does 14 knots on the ocean; 9½ at half speed on lakes, 6 on Slow.

He let the Topdalsfjord's Captain pass him at the Mackinac Bridge because the Topdalsfjord's Captain said "he was faster." The Topdalsfjord had to slow at the bridge because of "heavy traffic."

He passed the bridge at 9:38. At 9:45 he heard the "May Day" call of the Cedarville after its collision with the Topdalsfjord.

At 10:45 he heard calls for help from his bridge. There were men in the water. He put down lifeboats; he saved four men and took in one dead. After the Cedarville sank he saw the bubbles. He had kept one mile behind the Topdalsfjord; he had heard signals from both ships.

The Cedarville was a blip on his four mile range. It was misty and foggy. The Weissenburg sounded its fog signals. The Topdalsfjord was a mile ahead of him.

He had told the Cedarville Captain there was a Norwegian ship ahead of him; the two ships were apparently approaching each other. The Cedarville was on his starboard side. He wanted to keep a mile from the Topdalsfjord. When he passed the Bridge the Topdalsfjord was in front of him, and the Cedarville was one point off on his starboard side. Looking at his radar he could see "They are coming together now." Two minutes later he heard the "May Day" call. *The Cedarville had gone North of the normal line, a little north of the course.*

The Cedarville's Captain called him and told him "someone hit me, would you like to give me the name?" And then asked him for the "name of the Norwegian Ship."

He stated, "At the moment I am fine," but "He'd like to have the name of that ship."

When Captain May asked Captain Joppich on "what side he should come in to take off the Cedarville's crew" the Cedarville's Captain said, "Get out of my way —I will try to beach her." Captain May further related as follows: "He passed my bow, and he turned nearly around me, so he must be on a—let's say—westerly to southwesterly course—to go behind me—and I heard his voice, and a very fast going engine—like an old steam engine—and I saw a shadow—and then I stopped my ship by maneuvering—you can see it in my rough log book—to come clear of him." "He was aft of me and he came back to my starboard side and that is the moment—from this moment on—I followed him, really, because I said, "Don't lose him, there must be something wrong—because I heard the noise,—the propellor was very high out of the water." I was worried he didn't know where to go. He went around like this on full speed, his engine running." He also said, "I'd like to ground her."

Captain May testified that on hearing the "May Day" call he went to Slow speed; then to 3 to 6½ knots at 9:45; then dead slow ahead till the Captain told him he didn't want any help.

He stated that the men were not ordered off fast enough; that the Captain should have let the men off sooner since he had no further use for them. Indeed, there was no *evidence anywhere in the case that Captain Joppich had any possible need or use for any one of these 20 or more men who* stood in life jackets for one half hour waiting to get off. Captain Joppich at no time ever stated there was a need for any one of them to remain.

Captain May testified that the Cedarville Captain seemed slow to understand that his ship was going to sink.

He further stated that when Captain Joppich decided to beach his ship he operated it "astern behind me," and went in a semi-circle. He also said that as the Cedarville moved ahead he went on Slow behind her; that his lookout man saw a white boat on his port bow. The Cedarville was on a southeast course; that he could see the Cedarville going down under the water. The Topdalsfjord was half a mile away and did not follow the Cedarville.

He stated he'd heard men cry in the water; he took the first survivor between 10:46 and 10:49. He picked up seven men on a life raft and fourteen men with one dead in a boat; and later four survivors and one dead body. He arrived at the scene at 10:45. It took

nearly an hour to get the last survivor aboard his ship. He put over a derrick as some men could not use the ladder. He said the visibility had been 150 feet, and he heard a "hard going engine and voices. The Cedarville went from there around me like that."

Captain Gilbert testified he'd been 32 years on the Great Lakes; that he was in command of the Steinbrenner, a freighter, and was upbound on May 7, 1965 for Green Bay, in South Channel, 302 degrees, in dense fog; that he talked to the Ford at 8:33; he gave whistle signals to the Topdalsfjord four times and got no answer; this was in dense fog and blowing signals, but no response. The Topdalsfjord passed 200 feet from him moving quite rapidly, going 4 to 6 miles per hour. At 9:50 Captain Gilbert got the Cedarville's "May Day" call that it was hit amidships and "may be sinking."

Walter Tulgetske testified that he was a sailor of 26 years' experience, having joined the fleet in 1940, and that he had put in some 27 months in the U. S. Navy, and that he had been a Chief Engineer since October, 1964.

He related that as a general rule on alarm men get topside, put on their life jackets, and take their stations. He stated a card at each man's bunk tells him where to go on an alarm signal. He related, on examination of Counsel Keig, that there had been no general alarm. Describing the ship, he stated that the ship had three decks, with the engine room and coal bunker aft; that the throttle controls were in the engine room; that the chadburn was behind the throttle; its signals were given by electric power. It had a bell which was noisy. The ballast tanks contained water; there were eight on each side.

There was one oiler, one stoker and one engineer; the engineer makes the necessary changes; the oiler is on his rounds; the stokeman is in the boiler room. The chadburn can be heard everywhere. There were five or six ways to get out of the engine room.

He related they were going full speed in dense fog. That fog whistles tell them that other ships are around. That there was a blast of 30 to 60 seconds and then he "felt and heard a thud." He saw the bow of the other ship. He was not thrown off his feet. The No. 4 tank was the area of damage.

He went down to start the pump to pump out the water on tank No. 4. It took three to five minutes to start it. The main engine stopped and started. It has a 5250 gallon capacity a minute. The oiler went with him. He saw there was water in the tunnel. The ship showed a three foot list, which showed on the gauge board. The ship was coming back to an even keel. They were going to look topside.

He saw that all freeboard was lost. No general alarm was sounded. No order to abandon was given. He got in a lifeboat. He was then one minute out of the engine room. The lifeboat was five feet from the water, bow down first. The ship lurched to starboard; he jumped out of the lifeboat, outboard (meaning away from the ship). The ship was going down, its stern still in momentum. The ship rolled to starboard and down by the bow.

This witness stated that the throttle in the engine room was set by notches and that the throttle would remain set whenever desired.

He also stated the lifeboat never came afloat.

He stated that he never knew what the Master intended.

He further stated that the main engine was operating when the vessel sank.

He was in the water a half hour when picked up by the ship's lifeboat and then by the Weissenburg, whose operation was good.

At the Coast Guard hearings, Tulgetske was examined by Commander Gove, and represented by Mr. Roman Keenen, who also represents Petitioners herein.

He had been the First Assistant Engineer on the Cedarville. Below deck he heard a thud, and a long blast; he could

see the bow of the other ship, and he grabbed a life jacket. Water was rushing through the gangway. There was a three foot list to port and he was ordered to ballast on the starboard side, all on orders from the Chief Engineer, who got his orders from the pilothouse. He was ordered to get more help. He worked on the pumps. One handled 3600 gallons a minute; one 5250, each of two, 2000. They could pump 12,850 gallons a minute. Finally, the Chief Engineer said, "There is nothing more we can do." The ship was setting and taking water on deck. It started to roll. He jumped into a lifeboat. He knew they could get swamped in a lifeboat. He could see the rudder and wheel up in the air. He jumped outboard from the lifeboat. Another lifeboat later picked them up. The Weissenburg was good to them.

The last time he saw it there was a six inch list to port on the inclinometer.

Ivan Trafelet was the 8:00 to 12:00 Lookout. His task was to look for danger and to listen for signals. There were three in the pilothouse. At first it was quite foggy; they could see a half mile; the fog thickened; they were giving fog signals.

He stated that there was no general alarm given; that the anchor was dropped four minutes after the collision; there was a port list; he got a life jacket and went back to the bow. The damage was to the port side, and the list was 20 degrees.

The First Mate, Piechan, told him they were trying to beach it. He didn't think he could do anything after he learned they were beaching it. It did not have as much freeboard. The water was coming on deck. He went to the davit. There were two men there. The lifeboat had such a list he couldn't make it. There was then 600 feet of visibility.

Ivan Trafelet, when examined by Commander Gove of the Coast Guard, related that he was a Watchman on the Cedarville and his job was to see and hear. He was on the port wing of the pilot-house. Visibility was fair. The Cedarville was blowing fog blasts.

He saw a ship and reported to the Captain. It was 45 degrees off the port bow. It was 600 feet away. The other vessel was a boat length off, 600 feet. It was 600 feet between vessels.

He saw the Topdalsfjord hit the Cedarville "approximately amidships." He heard the Third Mate say "They've got to drop anchor." The anchor took hold. They had to back up. The anchor came up. The First Mate said they were "going to try to beach it."

The freeboard was getting low. The water was coming on deck. He got a cut in the head, and was in a daze; he was a half hour in the water.

William John Friedhoff, 10 years on the Lakes, was on Watch 4:00 to 8:00 A.M. He was an oiler who worked on the engine oiling system and the water pumps. They were struck by another ship at 9:45 A.M. He saw the bow of the salt water ship backing off. There was fog.

He took the cover off the port lifeboat. He cranked the boat down to the railing; he said there was a little port list; eight or ten men were there waiting for orders, but they never got any orders—they got no orders between the collision and the sinking. Water was coming down the side amidships so they got in the lifeboat.

She rolled over, in mid-air. The ship was on its side when he hit the water. The boat was free when he came up.

They had been going full speed in fog. It was a slow boat.

When they were first hit she bounced up and down a little bit, "enough to wake me up."

Louella Jane Brege testified that her husband works for the Bradley Transportation Company; that he is 39 years old and has been on the Lakes 19 years. The preceding Sunday evening (before giving her testimony) she talked to Radtke, Parrilla and Lang about her testimony. She lives in Rogers City. Her husband had been First Assistant Engineer; he is

now a Chief Engineer. This was not a social call; it was a pre-deposition call.

She has a ham radio set. She listens every day. It's on all the time, morning to 7:00 P.M. Stations 22 and 51. She hears boats on 51. Turned it on at 7:00 A.M., Channel 83, for ships. Listened at 11:00 A.M.; talked to her father about this. Stunned at the news. Heard talk with Coast Guard. The word was around she heard it on radio. She heard on 61, the Michigan line on the Central Radio, asking the position of the Cedarville of the Coast Guard. "Please stand by till the Munson is there." "They said that certain men were on the Weissenburg." "There was a certain number of men on the Weissenburg and bodies, and a certain number on the Coast Guard ship."

The testimony of Harry Bey—the last survivor from the engineroom—presents a harrowing tale. Bey, on his deposition, said he was born June 18, 1921, at Rogers City, that he was a First Engineer in the Bradley Fleet, and that he had been in the Navy Reserve, World War II. He said also that there were two direct means of communication between engineroom and pilothouse of the Cedarville: a chadburn and a telephone.

They had been going full speed in fog. His watch ended at 8:00 A.M. He had been sleeping and he heard a rumble like running aground; he went back on the deck and helped get the pumps working. The Chief, Third Assistant and oiler were in the engineroom.

When the water was lapping on the main deck, the ship rolled over and a wave caught him; he was washed into a room; his leg hurt (it was broken); he couldn't open the door. The room was full of water when he crawled out of a porthole. There had been no general alarm bell. There had been no order to "abandon ship." All pumps were running full, filling the starboard side of this vessel with enough water to tilt the ship into its final convulsion. He too said that the Cedarville could have run with nobody in the engineroom, that "You could leave with no one there for some time. The throttle would stay in

position until it was changed." He stated that he heard no talk of getting the men out. No warning was given to the crewmen in the engineroom that the ship was about to submerge. There was no water in the engineroom to warn them.

He also confirmed that they had gone full speed in fog, and that the fleet always operates full speed in fog.

At the Coast Guard hearing, when questioned by Commander Gove, Bey again said that he was asleep when it happened, that when he was washed around in the room his leg was broken. He reiterated that one lifeboat was capsized to starboard. He was in the water 10 to 15 minutes. He was taken in tow to the German ship and struggled up the gangway onto the ship.

Before Commander Gove of the Coast Guard, Rasmus Hoagland, Master of the Topdalsfjord, stated he started for the North American Lines in 1925, became a Master in 1951, and took the Topdalsfjord in 1959. This was his 18th trip on the Great Lakes, through the Mackinac Straits every time, in and out—four times in fog.

He was on the bridge; the pilot and he claimed to have visibility for five miles. The Second Mate, Wheelsman and wireless operator were with him on the bridge. His ship was 423 feet long; 54 beam; 6200 H./P.; Diesel Motor Vessel and carried general cargo. She had five cargo hatches, 3 forward of the bridge. On May 7, 1965, she was bound for Port Arthur. Visibility was reduced from 4–5 miles to ½ mile. He then cut his speed proceeding on dead slow ahead, 30–40 R.P.M. 3–4 miles through water, at half speed, she could do 8.5 to 8.7 and at full out 15½ miles per hour.

He asked to pass the Weissenburg. He did so. He could hear the Weissenburg's signals. He saw a vessel coming from the East on his radar; he went to slow speed 0903; the other vessel was approximately 4 miles east. He passed a vessel 2 miles West of the Mackinac Bridge.

The ship passed the Bridge north of the center line; and he decided to go by in the South Channel. He heard a whistle, fog signals, and an echo on starboard bow. He changed to 108 degrees under the Bridge; the echo was heard again at 20 degrees off the starboard bow: Range 1½ miles on radar. The Topdalsfjord continued at a reduced speed; at 0935 it was still on dead slow. He heard signals astern—from the German vessel. Again from the bridge of that ice-breaker he heard the echo and the whistle—3 short every minute. At 0943 he could not see the approaching vessel so he stopped the engines. Speed was estimated at 3–4 miles per hour.

Then he heard a screaming long blast, then saw the shadow of a ship; he backed the Topdalsfjord once or twice. Visibility was about 200 yards or more. The Cedarville had a swinging effect to starboard slightly; blowing long, long, long blasts. He claimed that this was the first signal from the Cedarville; a long blast before he saw her; and that she was still blowing when she came out of the fog. He believes he was stopped when the contact was made. His vessel vibrated terribly on contact. It was like a bang; a bump.

The bow of the Topdalsfjord—reinforced for ice—hit the Cedarville about midship, for a fraction of a second imbedded, and then he dragged the ship over and headed down another course. He said the Cedarville was doing about seven miles per hour when contact was made.

He heard the Captain of the Cedarville say "I'm on a hard left wheel and trying to beach her." Then, "We are listing." Then he gave the impression "it was not so bad and he was hoping to beach her." He fixed the time of collision at 9:45. He had blown fog signals. He'd heard the Weissenburg tell the Cedarville that it had another ship ahead. His lifeboats were manned and they searched for survivors till 4:00 P.M.

Then from deposition of Captain Gilbert, Master of the Steinbrenner, we find that he had talked to Captain Joppich.

There was a mark on his radar screen. The Cedarville Captain said something to the effect that "if foreign vessels used pilots who knew rules" there would be less trouble.

Captain Joseph J. Parrilla was asked by Counsel Kleig if Captain Joppich had a drinking problem.

Albert R. Millberg, Radio Officer on the Topdalsfjord, said they collided with the Cedarville; the Skipper called the Coast Guard; he told the Weissenburg of the collision and to stand by; the Weissenburg said they could hear shouts and men crying; he heard the Weissenburg had two injured.

They had heard the Weissenburg and Cedarville talking; could hear "good", but the signal had no strength after the collision.

Jan Gonstal, Second Mate of the Topdalsfjord, saw the Cedarville at 50 to 60 meters; it was struck in center, amidships; it was going five to six miles per hour. He heard a "soft impact." Just before the collision he heard his Captain say "hard starboard rudder" and "full reverse of engines." The Captain put his engines in reverse.

Karl Fagerli, Chief Officer on the Topdalsfjord, related before Commander Gove, they hit the ship behind the bow; his ship was high.

He said they never stuck in her side; they "scratched along her side."

At the Mackinac Bridge he said the visibility was sometimes a mile, then fog.

In the Coast Guard Supplement, Captain May of the Weissenburg relates that he gave the Cedarville Captain the name of the ship which hit him.

He stated he did not hear the Cedarville calling the Topdalsfjord.

Captain Joppich, at Coast Guard hearing, on 5/18/65, repeated his history. He had once been in Coast Guard; in 1946 he became Third Mate, in 1952, Second Mate, in 1954, First Mate and finally Captain of the Cedarville.

He'd made 1,000 trips through the Straits.

He related there was an inter-com on the ship; he was bound for Gary and radar was O.K.

He stated that "We should have pilots on those ships."

He said they had no trouble talking to the Weissenburg, but when they called the Topdalsfjord they got no answer. They couldn't "get a line into the Topdalsfjord."

They were going 2 to 3 miles per hour on slow speed.

The Topdalsfjord was at a 45 degree angle from him; 900 feet away when he first saw her, going 6 miles per hour. It was coming toward him at a 45 degree angle. He put the chadburn full ahead, and turned hard to right and then hard left but was hit at right angles. "He listed me to starboard." It did not knock him off his feet. He'd been listed 10 degrees to starboard.

"We had gone hard right on 325 degrees, then hard left, which slowed us down;" he then spun the vessel left to port before impact, and threw the stern away from him. "The Cedarville was doing 5 miles per hour. The port side was damaged; penetrated."

The ship suddenly lurched. Joppich said, "There was no time for signals; no nothing."

Thus endeth our summary of the cogent testimony as chronologically adduced.

The strongest human instinct is self preservation; consequently, in law, men have a right of self-defense. One has an inherent right and duty of preserving his own life. When one gives up such right to the control of the Master of a ship, that Master has correlative duty of becoming his protector; he has a duty of using his superior skill, experience, and knowledge to protect him. He has a duty of considering the lives and safety of his crew as being more necessary of preservation even than that of the owner's property. In this catastrophe, we find that this Captain utterly failed to do so. He gave all his attention, effort, thinking, and activity to saving property and no single thought, express or implied, to his men. He had an aberration for saving property, and an amnesia for saving people. He overlooked the fact that some thirty lives on that ship were as important, in law, as his own; and, that from the viewpoint of the Captain's duty, that each and every one of such thirty lives was more important than his own in the sense that they loyally transferred to him their right to live, while he, by what he did, considered all of them as being entitled to less or no attention from him, than a ship which from the moment of collision, could proverbially not have been saved "by all the King's horses and all the King's men."

Had all the ships on the Great Lakes answered the final May Day call for help made by Captain Joppich, immediately before the sinking, their combined power could not have lifted the Cedarville to another single inch of freeboard. The ship was as doomed as were the more than twenty men he looked at and could not see.

In view of our ruling on the law, and the evidentiary facts as we find them, this Court makes the following findings and comes to the following conclusions, some of which have been heretofore intimated:

### FINDINGS OF FACT

1. Prior to collision, and up to a point where collision was inevitable, the Cedarville proceeded at full speed ahead in a dense fog.

2. It was the general practice of the Bradley Fleet to order its ships to proceed at full speed ahead in the fog.

3. Prior to collision, the Cedarville, pursuant to order of its owners, deviated from recommended courses published by United States Coast Guard which regulate the flow of traffic thru the Mackinac Straits and the confusion resulting therefrom contributed to the collision.

4. Prior to collision, when the Cedarville received no signal from the

Topdalsfjord, the Cedarville failed to sound a danger signal and/or reduce speed.

5. The internal construction of the Cedarville so permitted the proliferation and distribution of water surging thru a break in the outer shell as to render the swift sinking of the Cedarville a certainty.

6. From the moment of collision, considering the constructi n of the Cedarville, the damage ii flicted by the prow of the Topdalsfjord, and the additional 14,411 tons of cargo, and her position in the water, it was obvious that there was no reasonable chance of successfully beaching this vessel.

7. During the seventeen minute interval between collision and the turn for the beach, while the Cedarville lay at anchor with the Weissenburg nearby begging permission to come alongside, the entire crew could have been evacuated in complete safety.

8. A majority of the members of the crew who were topside were assigned no duties prior to embarking for the beach and performed no duties during the beaching attempt.

9. Prior to executing his plan to beach, Captain Joppich ordered the full engineroom crew to their posts; the presence of all below was unnecessary.

10. From the moment of collision at 9:45 until the decision to beach was announced at 10:02, the Cedarville lost sufficient freeboard as to indicate with certainty that the beach could not be reached.

11. It was the policy of the petitioner, United States Steel Corporation, to repose total authority in its ship Captains for the conduct of each trip; even in the event of collision, the discretion of the Master was unfettered and uninhibited by any order or advice from a superior officer of the corporation despite the ready availability of ship to shore communication for vessels on the Great Lakes.

12. The highest officers of the petitioner in charge of lake shipping were cognizant of the ship's constructional characteristics, were aware immediately that the ship had been in a collision which pierced her hatches, and were informed that Captain Joppich was keeping the full crew on while attempting to beach her.

13. These same corporate officials knew that the Cedarville would sink. According to their own testimony, members of the highest echelon of the petitioner's corporate structure were aware that the wound inflicted by the Topdalsfjord would cause the Cedarville to "sink like a brick."

14. These officials of the corporation, although informed of the seriousness of the collision and aware of the certain failure of the beaching attempt, nevertheless did not intervene to prevent the full consequences of the announced plan of its agent, Captain Joppich.

15. Petitioner failed to provide the ship's Captain with requisite information concerning the buoyancy, stability and trim of the vessel, so that the Captain was not informed of the maneuvering characteristics of the Cedarville.

16. Prior to the execution of Captain Joppich's plan to beach the vessel, he did not calculate:

1. The distance to the shore.

2. The rate at which his freeboard was receding.

3. The probable speed attainable.

4. Whether his speed afloat would be retarded by the continuing influx of water, and if so, at what rate deceleration would occur.

5. The time needed to beach the vessel.

17. Captain Joppich ordered water pumped *into* tanks on the starboard side; his failure to rescind the order, when the list to port had been corrected, resulted in water entering the starboard side at a greater rate than water entering through the gash on the port side. This order of the Captain thus caused the starboard side of the ship to fill faster and ultimately caused the ship to lurch convulsively and capsize to starboard.

18. It was not necessary to keep a full crew in the engineroom during the beaching operation; the engines could have been set at any speed and held there automatically. So long as one engineman remained on board to reset the engines if a change in speed became necessary, there was no danger in releasing all the other engineroom personnel from the ship. However, no ship going a maximum of two miles an hour at full speed, without any appreciable freeboard remaining, required the constant attention of an engineer. Under the circumstances prevailing, approaching the final capsize of the ship, there was really no necessity for any engineer remaining on board.

19. The men in the engineroom were never released from their posts.

20. Retention of topside personnel aboard the ship served no useful purpose; as the steadily diminishing freeboard ebbed away, and even Captain Joppich knew that the ship was going down, he did not free his men to permit them a safe entry into the water in lifeboats.

21. No order to abandon ship was ever issued by the Captain, even when her decks were awash.

22. Ten lives were lost.

## CONCLUSIONS OF LAW

1. Maritime law permits the recovery of punitive damages against a maritime tortfeasor whose misconduct evinces a reckless and wanton disregard for the rights of the claimants.

2. The survival action created in 1910 by Congress for railroad employees and their survivors (45 USC § 59), which was extended to seamen and their survivors through the enactment of the Jones Act (46 USC § 688), perpetuates the wrong inflicted upon the deceased seaman so that the action brought by the designated survivors' is the same action which a seaman so mistreated could bring.

3. Under the Jones Act a seaman may sue his employer for, *inter alia,* punitive damages if he has been injured as a direct and proximate result of such conduct on the part of his employer as would show a reckless disregard for the legal rights of the seaman.

4. The concept of punitive damages evolved through the common law and has long been recognized in civil and admiralty courts as a potential element of damage in tort cases. Consequently, there was no necessity for Congress to specify that punitive damages may be recovered under the Jones Act; language of general import is sufficient.

5. The seaman is absolutely bound to follow the orders of the Master of the vessel; there is a correlative duty reposed in the Master and the owner of the vessel to secure the safety and welfare of the crew. Both the Master and the owner acted in callous disregard of their duty to the crew.

6. The petitioner reposed such total authority in Captain Joppich in the operation of the Steamship Cedarville as to raise him to the highest level of corporate power; in this case, the Captain was the alter-ego of the petitioner. While in command of that vessel, he had no higher authority; no officer of the cor-

poration directed or controlled his actions.

7. When the corporate officials in charge of the petitioner's shipping enterprise were informed of the proposed actions of its agent, Captain Joppich, and they realized with certainty the catastrophe which would follow, there arose a duty to speak out to prevent the full consequences. The failure to speak evinces a conscious acquiescence to the acts of the agent.

8. Acquiescence to the known tortious acts of its agent by the corporate principal is tantamont to a ratification of those acts, making the corporation *particeps criminis* in the unlawful or tortious misconduct of its agent.

9. The Acts of Captain Joppich are those of the petitioner, United States Steel Company.

10. Prior to the collision, Captain Joppich exhibited a callous disregard for the safety of all ships and men (including his own) in the following respects:

a. Travel through a dense fog at full speed in violation of Rule 15.

b. Deviation from recommended courses in a narrow channel and a dense fog.

c. Failure to reduce speed and to stop and reverse when he received no signal from the Topdalsfjord, in violation of Rule 26.

d. Failure to know maneuvering characteristics of the vessel.

11. In ordering the beaching of the vessel, Captain Joppich was guilty of wanton and callous disregard for the safety of his crew in the following respects:

a. Directing the beaching without first calculating the navigational possibility of beaching.

b. Resisting the offer of assistance from the Weissenburg.

c. Failing to release to the lifeboats those men whose presence was not necessary for the dash to the beach.

12. In executing the plan to beach the vessel, Captain Joppich was guilty of a wanton and almost grotesque indifference to the safety of his crew in the following respects:

a. Failure to clear the engineroom of all personnel and set the engines automatically.

b. Failure to abandon ship when the hopelessness of the beaching operation became apparent.

c. Failure to rescind the order to pump water into the starboard tanks.

d. Failure to release any of his crew when the very decks of the Cedarville were awash.

13. The United States Steel Corporation is liable to the claimants for punitive damages.

The Court hereby expresses its appreciation for the courtesies, cooperation, briefs, etc., of all counsel throughout this case.

The Court will appoint a Commissioner to assess damages herein in the very near future.

(Should any counsel wish to make any suggestions with reference to the mechanics by which such Commissioner should operate, as to time, place, or in any other respect, etc., please advise us not later than two weeks from date of this filing.)